IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 2, 2013 Session

**STATE OF TENNESSEE v. HENRY FLOYD SANDERS**

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2008-D-3408      Cheryl Blackburn, Judge**

_____

**No. M2011-00962-SC-R11-CD - Filed November 10, 2014**

_____

This appeal concerns the admissibility of incriminating statements made by a defendant to the mother of a sexually abused child while the mother was secretly cooperating with the police in their investigation of the abuse. After a grand jury indicted him on six counts of aggravated sexual battery and four counts of rape of a child, the defendant moved to suppress his recorded statements. The trial court denied the motion to suppress, and a jury convicted the defendant of five counts of aggravated sexual battery and four counts of rape of a child. The trial court imposed an effective forty-year sentence. The Court of Criminal Appeals affirmed the convictions and sentence. *State v. Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App. Oct. 9, 2012). We granted the defendant's Tenn. R. App. P. 11 application to address the legal standard courts should use to determine the admissibility of incriminating statements obtained by the parent of a victim of sexual abuse who is secretly cooperating with law enforcement officials investigating the child abuse charges. We find no violation of the defendant's constitutional right against compelled self-incrimination because the defendant merely misplaced his trust in a confidante to whom he voluntarily confessed. Therefore, we find that the recording of these statements was admissible.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal); Melissa Harrison (at trial and on appeal); and Jessamine Grice (at trial), Assistant Public Defenders, for the appellant, Henry Floyd Sanders.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; John H. Bledsoe, Senior Counsel; Victor S. Johnson, III, District Attorney General; Sharon Reddick and Kristen Menke, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.

In 2003, Henry Floyd Sanders met and began a relationship with L.S.[1] when they were both living in southern Mississippi. At some point, Mr. Sanders and L.S. began living together, along with L.S.'s five-year-old daughter, A.S. In 2005, L.S. gave birth to Mr. Sanders's son. Following the devastation of the Gulf Coast by Hurricane Katrina in 2005, Mr. Sanders, L.S., and the two children moved to Nashville.

Both Mr. Sanders and L.S. were employed at the same big box retail store in Nashville. L.S. worked a night shift and was home with the children during the day. Mr. Sanders worked a day shift and took care of the children at night while L.S. was working. During the evenings when L.S. was absent, Mr. Sanders began touching A.S. inappropriately. These acts escalated over time to the point where Mr. Sanders regularly engaged in sexual conduct with A.S.[2]

Mr. Sanders and L.S. ended their relationship in January 2007. Mr. Sanders moved into an apartment, and L.S. and the children moved into a duplex. The children occasionally spent the night with Mr. Sanders at his apartment. At this point, A.S., who was in the third grade, began seeing the school guidance counselor. A.S. later testified that she had developed a "real bad anger problem," and wanted advice regarding conflicts with her mother. During her second visit with the counselor, A.S. revealed that she was "getting sexually abused" by Mr. Sanders. Based on A.S.'s statements, the Metropolitan Police Department and the Department of Children's Services ("DCS") started an investigation.

When Mr. Sanders's conduct first came to light, L.S. was "in denial" and "didn't want to . . . believe that the father of my son had done these things to my daughter." After A.S. revealed additional details about Mr. Sanders's conduct, L.S. decided that she wanted to talk

_____

[1]To protect the identity of the victim in this case, we are identifying the victim and her mother by their initials.

[2]The issues in this case do not require us to repeat A.S.'s detailed accounts of Mr. Sanders's conduct.

with Mr. Sanders face-to-face "for closure purposes" and to find out whether Mr. Sanders would admit to engaging in the conduct described by A.S. Accordingly, she agreed with Detective Josh Mayo's suggestion that she wear a concealed microphone during her conversation with Mr. Sanders.

On April 24, 2008, L.S. and Mr. Sanders talked for one hour and forty-four minutes in the front yard of her home. Mr. Sanders drove there in his car, and he stood near his car the entire time. L.S. was wearing a concealed microphone, and Detective Mayo and another officer were listening to and recording the conversation in an unmarked police car parked nearby. The children were in the house and did not participate in the conversation. Detective Mayo called L.S. three to five times during the conversation to encourage her to stay calm and to remind her to ask Mr. Sanders about some of the important details that A.S. had provided in her interview with DCS.

L.S.'s tone during her discussion with Mr. Sanders was, at times, stern, but it was never heated or argumentative. She told him that "there are a lot of allegations right now about this" and that "I already know what happened; I need to hear it from you." Even though both DCS and the police had already started their investigations, L.S. led Mr. Sanders to believe that she could prevent the matter from going any further by not taking A.S. to an upcoming interview with DCS. She told Mr. Sanders that she had "the power to stop this thing" but that she needed Mr. Sanders to "be honest . . . about what happened." L.S. also told Mr. Sanders that "[t]his is in my hand . . . I need closure to this, that's all I want."

Mr. Sanders initially told L.S. that "[i]t did not happen." He denied sexually abusing A.S. and insisted that he could not have raped A.S. because he was impotent as a result of diabetes and colon cancer. He attributed A.S.'s sexual knowledge to the facts that the children had seen him naked when he was getting out of the shower and that A.S. had entered the bathroom one time while he was masturbating. L.S., clearly frustrated with these answers, responded that "[y]ou might as well just flat out be honest with me." She also warned Mr. Sanders that if he did not tell the truth, he would see his face on the television news.

Eventually, Mr. Sanders conceded that he first started touching A.S. inappropriately as she was getting out of the bathtub. Mr. Sanders also admitted that when he was drinking, he and A.S. would "wrestle" when she was wearing only her underwear or sometimes when she was naked. He also admitted that he had "laid on" A.S. in an inappropriate way when they were wrestling and that he had touched A.S.'s "private area" on occasions when she was sitting on his lap and when they were wrestling.

Later in the conversation, Mr. Sanders told L.S. he touched A.S. inappropriately when she crawled on top of him and that occasionally A.S. would kiss him on the mouth. He said that A.S. was "very curious" and that she initiated sexual activities with him, but that he never went so far as to honor the nine-year-old's requests to have sexual intercourse.

As the conversation wound down, Mr. Sanders asked L.S. for mercy and thanked her for talking with him. The conversation ended with L.S. telling Mr. Sanders that she would "think about" what she would do next. Mr. Sanders replied, "thank you for talking anyway."

One month later, L.S. placed a telephone call to Mr. Sanders while the police recorded their conversation. Mr. Sanders admitted nothing during their conversation. Thereafter, the police requested Mr. Sanders to talk with them. During the meeting on May 20, 2008, at the Nashville Criminal Justice Center, Mr. Sanders admitted nothing and declined to provide a DNA sample.

On October 21, 2008, a Davidson County grand jury indicted Mr. Sanders on six counts of aggravated sexual battery in violation of Tenn. Code Ann. § 39-13-504 (2010) and four counts of rape of a child in violation of Tenn. Code Ann. § 39-13-522 (2010 & Supp. 2013). Mr. Sanders entered a not guilty plea and later moved to suppress his recorded conversation with L.S. He argued that the admission of the recording violated due process and his constitutional privilege against self-incrimination. He insisted that L.S. was acting as an agent of the State when she talked with him on April 24, 2008 outside her home and that L.S. had overcome his will during that conversation and coerced him into making a false confession.

The Criminal Court for Davidson County held a suppression hearing on September 29, 2010. Both L.S. and Detective Mayo testified. Following the hearing, the trial court declined to suppress Mr. Sanders's statements. The trial court decided that even though L.S. was cooperating with the police, "she had an independent motivation to participate in the body wire," and thus did not qualify as a government agent. The court found it "completely reasonable that a parent would be independently motivated to confront their child's alleged molester to try to find out what happened to their child." Even if the mother qualified as a state agent, the court said, the mother's statements to Mr. Sanders during their conversation did not coerce Mr. Sanders into confessing against his will.

Mr. Sanders's trial commenced on January 31, 2011. The State's first witness, A.S., testified in detail about how Mr. Sanders had sexually molested her. During Detective Mayo's testimony, the State introduced the conversation between L.S. and Mr. Sanders that was recorded on April 24, 2008. Because of technical problems, the jury heard only the first

half of the actual recording. Detective Mayo read the remainder of the recording to the jury using a transcript of the conversation.

Prior to closing arguments, the trial court granted Mr. Sanders's motion for a judgment of acquittal on one of the aggravated sexual battery counts. The jury later found Mr. Sanders guilty of all the remaining counts – five counts of aggravated sexual battery and four counts of rape of a child. On March 23, 2011, the trial court denied Mr. Sanders's motion for a new trial and imposed an effective forty-year sentence.

Mr. Sanders appealed, and the Court of Criminal Appeals upheld his convictions and sentence. *State v. Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App. Oct. 9, 2012). On February 15, 2013, this Court granted Mr. Sanders's application for permission to appeal and docketed his case together with *State v. Fred Chad Clark II*, No. M2010-00570-CCA-R3-CD, 2012 WL 3861242 (Tenn. Crim. App. Sept. 6, 2012), another case that involved the police surreptitiously recording the defendant's incriminating statements to the victim's mother.

## II.

Mr. Sanders argues in this Court that the incriminating statements he made to L.S. while she was wearing a concealed police microphone were "involuntary and inconsistent with due process" because these statements were made only after L.S. repeatedly demanded that he confess and "falsely told him that if he confessed, he would not be prosecuted." In Mr. Sanders's view, this scenario "violated his rights against self-incrimination and to due process of law."[3] Accordingly, Mr. Sanders insists the trial court erred in failing to suppress these statements.

In Tennessee, the voluntariness of a confession is a question of fact. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *Self v. State*, 65 Tenn. (6 Baxt.) 244, 253 (1873). The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. *State v. Stamper*, 863 S.W.2d 404, 405 (Tenn. 1993).

When the trial court makes findings of fact at the conclusion of a suppression hearing, those findings are generally binding upon this Court unless the evidence in the record preponderates against them. The trial court is entrusted with determining the credibility of

---

[3]In his motion to suppress, Mr. Sanders additionally argued that L.S.'s recorded interrogation qualified as an unreasonable search and seizure in violation of the Fourth Amendment. Mr. Sanders later abandoned this argument, and so we deem it waived.

the witnesses, weighing the evidence, and resolving conflicts in the evidence, and it is not this Court's job to second-guess these determinations. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). On the other hand, when a trial court bases its findings solely on evidence for which witness credibility is not an issue, appellate courts may review that evidence de novo without a presumption of correctness. *State v. Northern*, 262 S.W.3d 741, 748 n.3 (Tenn. 2008); *State v. Payne*, 149 S.W.3d 20, 25 (Tenn. 2004). In this case, the trial court heard two live witnesses at the suppression hearing who described the circumstances surrounding the recorded conversation. Therefore, de novo review of the facts is not appropriate.

When reviewing a suppression motion, appellate courts should consider the entire record, including the evidence adduced at trial. We have also long held that the party who prevails at the suppression hearing is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Bishop*, 431 S.W.3d 22, 35 (Tenn. 2014) (quoting *State v. Echols*, 382 S.W.3d at 277).

Finally, even if a trial court commits non-structural constitutional error by failing to suppress an involuntary statement, we may affirm the conviction if the State proves beyond a reasonable doubt that the error did not affect the verdict. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008).

## III.

Mr. Sanders's principal argument, based on *State v. Ackerman*, 397 S.W.3d 617 (Tenn. Crim. App. 2012) (No Tenn. R. App. P. 11 application filed), is that L.S. was acting as an agent of the State when she elicited incriminating statements from him. The State, accepting the application of *State v. Ackerman*'s analytical framework to this case, insists that L.S. was not acting as an agent of the State because she had a "legitimate independent motivation" to question Mr. Sanders regarding his conduct with her daughter.[4] In this case,

---

[4]*State v. Ackerman* involved the prosecution of a father for sexually abusing his daughter. The defendant made incriminating statements to his ex-wife who was cooperating with the police. He challenged the admissibility of these statements on the basis that his ex-wife was acting as an agent of the State and that his statements were coerced by his ex-wife's threats and promises. The State, relying on the test used in *State v. Burroughs*, 926 S.W.2d 243 (Tenn. 1996), to determine whether a person is an agent of the State for the purposes of the Fourth Amendment, insisted that the ex-wife was not an agent of the State because she had "independent motivations" to call her ex-husband apart from gathering evidence for the police. After recognizing that the test in *State v. Burroughs* applied to alleged Fourth Amendment violations, the Court of Criminal Appeals decided that the test was "apt for determining whether there had been a Fifth Amendment violation." *State v. Ackerman*, 397 S.W.3d at 648. The Court of Criminal Appeals then

(continued...)

both the trial court and the Court of Criminal Appeals concluded that L.S. was not acting as an agent of the State during her conversation with Mr. Sanders because she was "independently motivated" to find out what actually happened to her daughter. Accordingly, we must address at the outset what role, if any, the "legitimate independent motivation" test that we adopted in *State v. Burroughs* and that the Court of Criminal Appeals employed in *State v. Ackerman* should have in the adjudication of an involuntary confession claim.

**A.**

Constitutional procedural protections generally shield persons only from acts of the government. However, in criminal proceedings, most courts have recognized two circumstances in which the actions of a private person who is functioning as an agent of the government may trigger constitutional protections.

The first circumstance involves private persons who are acting as "criminal informants" – persons who obtain evidence for the government in exchange for money or benefits (such as leniency in charging or sentencing decisions). Criminal informants generally qualify as government agents for constitutional purposes. *See, e.g.*, *State v. Smotherman*, 201 S.W.3d 657, 663 (Tenn. 2006) (noting that the common definition of "an 'agent' could include both a law enforcement officer and a criminal informant"); *State v. Dunn*, No. 85-356-III, 1986 WL 6322, at *3 (Tenn. Crim. App. June 6, 1986) (collecting United States Supreme Court cases finding that paid informants qualified as state agents) (No Tenn. R. App. P. 11 application filed).

The second circumstance involves private persons who conduct a search or seizure as an "agent or instrument" of the government. *State v. Burroughs*, 926 S.W.2d at 245. A private person may be considered an agent of the government if he or she conducts a search (1) with the government's knowledge and acquiescence and (2) without a legitimate independent motivation. *State v. Burroughs*, 926 S.W.2d at 245-46; *see also United States v. McAllister*, 18 F.3d 1412, 1417-19 (7th Cir. 1994) (applying this Fourth Amendment standard); *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985).

---

[4](...continued)
reversed the trial court's decision to admit the defendant's statements on the ground that there was no evidence in the record to support the trial court's finding that the defendant's ex-wife had an independent motivation for contacting him. *State v. Ackerman*, 397 S.W.3d at 649. This Court was never asked to review the Court of Criminal Appeals' opinion; it was published by the Court of Criminal Appeals pursuant to Tenn. Ct. Crim. App. R. 19.

Consistent with its decision in *State v. Ackerman*, the Court of Criminal Appeals chose in this case to extend the analytical framework of *State v. Burroughs* beyond unreasonable search and seizure claims under the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Constitution of Tennessee to involuntary confession claims under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 9 of the Constitution of Tennessee. We have determined that this extension is unwarranted.

**B.**

In the context of unreasonable search and seizure claims, the United States Supreme Court has observed that there is nothing constitutionally suspect when a private person decides to actively cooperate with the police. The Court stated that "it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge v. New Hampshire*, 403 U.S. 443, 488 (1971). Thus, the constitutional protection against unreasonable searches and seizures does not apply to "a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *United States v. Jacobsen*, 466 U.S. 109, 115 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)).

*Coolidge v. New Hampshire* involved a circumstance in which Mr. Coolidge's wife gave the authorities guns and other items that were later used against Mr. Coolidge in his criminal trial. Mr. Coolidge argued that Ms. Coolidge had been acting as an instrument or agent of the government because she had been complying with the authorities' request when she obtained the guns and other items and turned them over to the authorities and, therefore, that the seizure of the guns and other items was unreasonable. *Coolidge v. New Hampshire*, 403 U.S. at 487-88.

Responding to this argument, the Court noted that "[t]he exclusionary rules were fashioned 'to prevent, not to repair,' and their target is official misconduct. They are 'to compel respect for the constitutional guaranty in the only effectively available way – by removing the incentive to disregard it.'" *Coolidge v. New Hampshire*, 403 U.S. at 488 (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). The Court then determined that Ms. Coolidge did not qualify as an agent of the government because her motivation to assist the police was to prove that her husband was innocent of the murder for which he was eventually convicted. *Coolidge v. New Hampshire*, 403 U.S. at 489.

What we now know as the "legitimate independent motivation" test traces its lineage to *Coolidge v. New Hampshire*. Lower federal courts developed this test in the wake of the *Coolidge* decision, and in 1996, this Court adopted the test to determine when a private person becomes an "agent or instrument" of the government for the purposes of the Fourth Amendment and Article I, Section 7 of the Constitution of Tennessee. *State v. Burroughs*, 926 S.W.2d at 245-46. We pointed out in *State v. Burroughs* that the "critical factors" of this test are (1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search. *State v. Burroughs*, 926 S.W.2d at 246 (quoting *United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981)). In other words, the actions of a private person may be attributed to the government when the private person acts in concert with government authorities in pursuit of the same design or purpose. Both factors must be established in order to deem a private person a state agent. *State v. Burroughs*, 926 S.W.2d at 246.

## C.

Prior to 2012, issues relating to the admissibility of incriminating statements made to private persons cooperating with the government were resolved by ascertaining whether the statements were voluntary and not coerced. *See Clariday v. State*, 552 S.W.2d 759, 769 (Tenn. Crim. App. 1976); *see also State v. Pate*, No. M2009-02321-CCA-R3-CD, 2011 WL 6935329, at *10 (Tenn. Crim. App. Nov. 22, 2011), *perm. app. denied* (Tenn. Apr. 11, 2012). However, in its 2012 opinion in *State v. Ackerman*, the Court of Criminal Appeals shifted the initial focus of the inquiry from the voluntariness of the statements to the relationship between the government and the person to whom the statements were made.

In *State v. Ackerman*, the mother of a child sex-abuse victim cooperated with the police in a recorded telephone call with the victim's father who was the suspected abuser. *State v. Ackerman*, 397 S.W.3d at 626-27. The admissions she elicited led to the father's convictions for multiple sex crimes. Prior to trial, the court determined that, although the mother was cooperating with the police, she was not an agent of the government because she had "independent motivations" to talk with the victim's father about what had happened. *State v. Ackerman*, 397 S.W.3d at 648. Based on this conclusion, the trial court found that the father's incriminating statements to the victim's mother were admissible.

The Court of Criminal Appeals disagreed with the trial court. Its analysis was based on *State v. Burroughs*, even though the court acknowledged that *State v. Burroughs* had been fashioned to address admissibility questions arising under the Fourth Amendment and Article I, Section 7 of the Constitution of Tennessee. *State v. Ackerman*, 397 S.W.3d at 648. Despite its conclusion that Ms. Ackerman had used "threats, inducements, and psychological coercion" during her telephone call with Mr. Ackerman, *State v. Ackerman*, 397 S.W.3d at 647, the court stated that the pivotal question was whether Ms. Ackerman was a "state actor"

when she made the telephone call to her ex-husband. *State v. Ackerman*, 397 S.W.3d at 647. The court believed that Ms. Ackerman's relationship with the authorities was outcome-determinative because "if [Ms. Ackerman] did not make the call as an agent of the state, then her actions, no matter how offensive or outrageous, would not require suppression of the defendant's statements." *State v. Ackerman*, 397 S.W.3d at 647.

The State insisted that Ms. Ackerman was not acting as an agent of the State when she made the telephone call to Mr. Ackerman because she had a "legitimate independent motivation" for making the call. *State v. Ackerman*, 397 S.W.3d at 648. Even though the trial court had found that Ms. Ackerman had "independent motivations" for the call, the Court of Criminal Appeals decided that there was "no evidence in the record [that] supports this finding" and that "the record does not support a finding that it was her concern as a parent that actually motivated or prompted her to make the call in this case." *State v. Ackerman*, 397 S.W.3d at 648-49. Accordingly, the court decided that Ms. Ackerman was a "state actor" and, therefore, that the trial court erred by failing to suppress the audio recording of her telephone call to Mr. Ackerman. *State v. Ackerman*, 397 S.W.3d at 649.[5]

Another panel of the Court of Criminal Appeals later dealt with a similar scenario in *State v. Clark*, No. M2010-00570-CCA-R3, 2012 WL 3861242 (Tenn. Crim. App. Sept. 6, 2012), *perm. app. granted* (Tenn. Feb. 13, 2013). In the *Clark* case, Ms. Clark, the mother of two alleged child sex-abuse victims, assisted the police by secretly recording two conversations with her husband who was the suspected abuser. Although the trial court decided that Ms. Clark qualified as a state agent under the *Burroughs* test, it found that she did not overcome the defendant's will and thus did not violate his right to refrain from self-incrimination. *State v. Clark*, 2012 WL 13861242, at *28.

Addressing the admissibility of the recordings of Ms. Clark's conversations with Mr. Clark, the Court of Criminal Appeals decided that "the evidence does not preponderate against the trial court's determinations." *State v. Clark*, 2012 WL 13861242, at *28. The court's analysis did not include a discussion of *State v. Burroughs* or its own more recent opinion in *State v. Ackerman* and did not address whether Ms. Clark was an agent of the government when she made the telephone calls to Mr. Clark. Rather, the court parsed the statements made by Ms. Clark during these telephone conversations – which were quite similar to the statements made by Ms. Ackerman during her telephone conversation with Mr. Ackerman – and determined that these comments did not amount to threats, inducements, or

---

[5]The Court of Criminal Appeals also decided that the admission of the audio recording of the telephone call was harmless error because Mr. Ackerman's testimony at trial "largely matched the admissions he provided during the telephone conversation." *State v. Ackerman*, 397 S.W.3d at 649.

psychological coercion. Instead, the Court of Criminal Appeals decided that Ms. Clark's deceptive statements related to

> their personal life, not whether the State would prosecute him if
> he did not confess or afford him leniency if he confessed. Even
> if she had made such representations, she had no authority as a
> private citizen to do so. Proof of Ms. Clark's deception of her
> husband does not equate to proof that he was coerced by the
> police.

*State v. Clark*, 2012 WL 13861242, at *28. The court also concluded that the evidence supported "the trial court's finding that [Mr. Clark's] free will was not overborne by Ms. Clark's actions." *State v. Clark*, 2012 WL 13861242, at *28.

Approximately one month after the opinion in *State v. Clark* was filed, a separate panel of the Court of Criminal Appeals handed down an opinion in this case. The court, without addressing the opinion in *State v. Clark*, resorted to the approach adopted by the panel in *State v. Ackerman*. *State v. Sanders*, 2012 WL 4841545, at *9. On this occasion, the court agreed with the trial court's conclusion that even though the State was "aware" of the recorded conversation, L.S. was not acting as an agent of the government because her professed desire to obtain closure for herself and her daughter provided her with an independent motivation to confront Mr. Sanders in an effort to find out what had happened to their child. *State v. Sanders*, 2012 WL 4841545, at *10.

The Court of Criminal Appeals found it unnecessary to address whether Mr. Sanders's statements were voluntary because, following the reasoning of *State v. Ackerman*, it had determined that L.S. was not acting as an agent of the government when she elicited the statements from Mr. Sanders. *State v. Sanders*, 2012 WL 4841545, at *10. Nevertheless, the court then proceeded to address the voluntariness of Mr. Sanders's statements "to facilitate any further appellate review." *State v. Sanders*, 2012 WL 4841545, at *10. The court parsed L.S.'s statements, which were not dissimilar to either Ms. Ackerman's statements or Ms. Clark's statements, and decided that the "totality of the circumstances reveals that [Mr. Sanders] was not coerced by [L.S.] into making a statement or confession." *State v. Sanders*, 2012 WL 4841545, at *11.[6]

---

[6]Even though the court had decided that L.S. was not an agent of the government and that, as a factual matter, Mr. Sanders had not been coerced into making the disputed statements, the Court of Criminal Appeals hedged its bets by also finding that even if the admission of Mr. Sanders's statements to L.S. was error, the error was harmless "in light of the relatively non-incriminatory nature of [Mr. Sanders's]
(continued...)

-11-

The differences between the analytical approaches and outcomes in these three cases underscores the need for uniformity. We have decided that the Court of Criminal Appeals erred in *State v. Ackerman* when it decided that the Fourth Amendment "legitimate independent motivation" test is also "apt for determining whether there has been a Fifth Amendment violation." *State v. Ackerman*, 397 S.W.3d at 648.

**D.**

We note first that the purpose of the exclusionary rule under both the Fourth and Fifth Amendments is to deter police misconduct.[7] Courts have always recognized that the exclusion of evidence may hamper the truth-finding function of the trial and can lead to criminals escaping punishment on account of police negligence or misbehavior. *United States v. Leon*, 468 U.S. 897, 907 (1984); *see also State v. Housler*, 193 S.W.3d 476, 489 (Tenn. 2006) (quoting *Lego v. Twomey*, 404 U.S. 477, 484 n.12, 485 (1972)). On the other hand, the courts have opined that the exclusionary rule is the best deterrent to prevent police from violating suspects' constitutional rights. The corollary to this observation is that evidence gathered by private persons is generally not subject to the exclusionary rule because with private action there is no police misconduct to be deterred. *See United States v. Leon*, 468 U.S. at 906-10; *United States v. Janis*, 428 U.S. 433, 447-54 (1976).

The *Burroughs* test is a reasonable exception to this rule because the rights protected by the Fourth Amendment and Article I, Section 7 are particularly vulnerable to abuse. *See* Alfred M. Knight, *The Life of the Law* 125 (1996) ("Fourth Amendment rights are inherently fragile because they have no broad constituencies."). An unreasonable search can be successfully conducted without the suspect being present or even being aware that the search is occurring or has occurred. Permitting the police to circumvent the exclusionary rule by simply recruiting private actors would undermine the purpose of the constitutional protection against unreasonable searches and seizures.

The right against self-incrimination – at least in the context of oral incriminating statements or confessions – is not as vulnerable to abuse. No state agent or private person can elicit a confession from a suspect in the suspect's absence or without the suspect's knowledge. The Fifth Amendment and Article I, Section 9 are more concerned with the

---

[6](...continued)
statements." *State v. Sanders*, 2012 WL 4841545, at *11.

[7]*See State v. Huddleston*, 924 S.W.2d 666, 673-74 (Tenn. 1996); *State v. Johnson*, M2011-00792-CCA-R3-CD, 2012 WL 3731699, at *16 (Tenn. Crim. App. Aug. 29, 2012), *perm. app. denied* (Tenn. Jan. 14, 2013).

inherently coercive atmosphere that accompanies interrogation (or its functional equivalent) by the police. *See* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.10(b) (3d ed. 2007 & Supp. 2013) ("LaFave"). Thus, the constitutional right against unreasonable searches and seizures is substantively different from the constitutional right against compulsory self-incrimination. Because the *Burroughs* test was tailored for the more fragile Fourth Amendment rights, we do not find it appropriate to import the test into the realm of the Fifth Amendment or Article I, Section 9.

We also find the *Burroughs* test particularly inappropriate for situations in which the victim's friend or relative engages in a conversation with the suspect that is surreptitiously recorded by the police. These situations will *always* involve the State's knowledge and acquiescence, and the victim's friend or relative will *always* be able to articulate a desire to obtain the truth apart from any desire to assist an ongoing investigation. The person who obtains the confession need only express those independent motivations on the record.

Accordingly, we have decided that the "legitimate independent motivation" test recognized in *State v. Burroughs* should be confined to unreasonable search and seizure claims based on the Fourth Amendment or Article I, Section 7. In cases that involve suspects making confessions to friends, relatives, and other associates, the law need not be concerned with whether that confidant could properly be labeled as a private citizen or an agent of the State.

**IV.**

The circumstances in this case fall squarely in the line of federal and state cases in which a suspect has misplaced his or her trust in an accomplice or other confidant who is or who will be cooperating with law enforcement. We have observed that the Fifth Amendment and Article I, Section 9 forbid official coercion, not mere "strategic deception." *State v. Branam*, 855 S.W.2d 563, 568 (Tenn. 1993) (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)). These constitutional provisions are not concerned "with moral or psychological pressures to confess emanating from sources other than official coercion." *United States v. Erving L.*, 147 F.3d 1240, 1247 (10th Cir. 1998) (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

In cases in which police have surreptitiously recorded a conversation between a criminal suspect and the suspect's associate (with the associate's consent), courts have generally shown little interest in analyzing whether the person cooperating with the police qualified as a state agent under the Fourth and Fifth Amendments. The fact that the person making the recording is a state agent is generally either apparent or assumed, or the issue is ignored. Even when the person who obtained the confession is described as a state agent,

the United States Supreme Court has repeatedly stated that the Fourth Amendment "affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'" *United States v. White*, 401 U.S. 745, 749 (1971) (quoting *Hoffa v. United States*, 385 U.S. 293, 302 (1966)); *see also State v. Vanderford*, 980 S.W.2d 390, 401-02 (Tenn. Crim. App. 1997) (explaining that recording or transmitting an undercover agent's conversation with a suspect, even when done in the suspect's own home, does not violate the suspect's right against unreasonable searches and seizures), *perm. app. denied* (Tenn. 1998).

The seminal "misplaced trust" case is *Hoffa v. United States*. The case arose during the federal trial of Teamsters Union President Jimmy Hoffa in Nashville. A local Teamsters Union leader named Edward Partin was in jail in Louisiana facing a variety of state and federal charges when he agreed to cooperate as an informant with the government against Jimmy Hoffa and his associates. While Mr. Hoffa was staying in a Nashville hotel during his trial, Mr. Partin gained Mr. Hoffa's trust and became part of his entourage. On several occasions, Mr. Partin heard Mr. Hoffa and his associates discuss how they could illegally influence the jury in Mr. Hoffa's trial. Mr. Partin regularly reported these conversations to federal agents. Mr. Partin's testimony became crucial to the eventual prosecution and conviction of Mr. Hoffa and three other men for jury tampering. The criminal charges against Mr. Partin were dropped, and his wife received payments from the government. *Hoffa v. United States*, 385 U.S. at 294-300.

The trial court refused to suppress Mr. Partin's testimony concerning the incriminating statements he heard from the four defendants. As part of its ruling, the trial court found that Mr. Partin went to Nashville on his own initiative, that the payments to his wife were simply reimbursements for his "subsequent out-of-pocket expenses," and that there was "no necessary connection" between Mr. Partin's work as an informant and the fact that the prosecutions pending against him had fizzled out. The United States Court of Appeals accepted these findings as "supported by substantial evidence." *Hoffa v. United States*, 385 U.S. at 298-99. The United States Supreme Court was uninterested in whether Mr. Partin was working as a paid government informer when he infiltrated the Hoffa entourage. Instead, the Court assumed he was a government informer from the time he first arrived in Nashville, and "that the Government compensated him for his services as such." *Hoffa v. United States*, 385 U.S. at 299.

The Court then turned to Mr. Hoffa's allegations that Mr. Partin's testimony violated his rights under the Fourth and Fifth Amendments. Under the Fourth Amendment, the Court determined that Mr. Partin's snooping was not an illegal "search" for verbal evidence. *Hoffa v. United States*, 385 U.S. at 300. Mr. Hoffa, the Court said, "was not relying on the security of the hotel room; he was relying upon his misplaced confidence that Partin would not reveal

his wrongdoing."  In fact, "[n]either this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."  *Hoffa v. United States*, 385 U.S. at 302.  Indeed, "[t]he risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society.  It is the kind of risk we necessarily assume whenever we speak."  *Hoffa v. United States*, 385 U.S. at 303 (quoting *Lopez v. United States*, 373 U.S. 427, 465 (1963) (Brennan, J., dissenting)).

Turning to Mr. Hoffa's Fifth Amendment right against compelled self-incrimination, the Court explained that "a necessary element of compulsory self-incrimination is some kind of compulsion."  *Hoffa v. United States*, 385 U.S. at 304.  Here, Mr. Hoffa's conversations with Mr. Partin and other associates had been "wholly voluntary."  "For that reason, if for no other," the Court found, "it is clear that no right protected by the Fifth Amendment privilege against compulsory self-incrimination was violated."  *Hoffa v. United States*, 385 U.S. at 304.  Thus, *Hoffa* established that, as long as the statements were made voluntarily, the evidentiary use of incriminating statements made within earshot of a police informant does not violate a suspect's rights under the Fourth or Fifth Amendment.

In *State v. Branam*, 855 S.W.2d 563 (Tenn. 1993), this Court confronted a situation in which a suspect's aunt was recruited by police to serve as a "jail plant" and extract incriminating statements from the suspect.  Although we did not cite *Hoffa*,[8] we reached the same result, i.e., that "[c]onversations between suspects and undercover agents do not implicate" the Fifth Amendment and Article I, Section 9.  *State v. Branam*, 855 S.W.2d at 568 (quoting *Illinois v. Perkins*, 496 U.S. at 296).  We explained that in Mr. Branam's case, "the suspect's trust was 'misplaced' in his own family member, with whom he was actively conspiring to obstruct an ongoing police investigation into the very offenses for which he was later charged and convicted."  *State v. Branam*, 855 S.W.2d at 568.  A misplaced trust scenario such as this one does not implicate a defendant's right against compulsory self-incrimination.  *State v. Branam*, 855 S.W.2d at 568.

Mr. Branam also asked this Court to adopt the viewpoint concerning police trickery that Justice Brennan expressed in his concurring opinion in *Illinois v. Perkins*.[9]  We observed

---

[8]The Court in *State v. Branam* relied on the United States Supreme Court's decision in *Illinois v. Perkins*, which in turn relied on *Hoffa v. United States.*

[9]Justice Brennan joined the Court's judgment in *Illinois v. Perkins* that the rule of *Miranda v. Arizona*, 384 U.S. 436 (1966), does not apply when a jail plant elicits incriminating statements from a suspect before charges are filed.  "I do agree," he said, "that when a suspect does not know that his questioner is a

(continued...)

that "[i]nvoking the Fourteenth Amendment's guarantee of due process, Justice Brennan would require a review of the 'totality of the circumstances' surrounding elicitation of a suspect's statement by deceptive means, in order to ensure that the defendant's 'will was [not] overborne.'" *State v. Branam*, 855 S.W.2d at 568-69 (quoting *Illinois v. Perkins*, 496 U.S. at 303 (Brennan, J., concurring)).

Without expressly adopting Justice Brennan's entire position, this Court nevertheless considered the circumstances and found that there was nothing in the record to suggest that Mr. Branam's statements to the informant, "most of which were made spontaneously on his part, were the result of a will that had been 'overborne.'" *State v. Branam*, 855 S.W.2d at 569. Thus, in *Branam* this Court reached the same result as the Supreme Court in *Hoffa*, although we went one step further and explicitly considered whether the defendant's statements were voluntary. We will follow the same approach in this case.

Tennessee courts have recognized on other occasions that the law provides no protection to a suspect or a defendant whose trusted accomplice or confidant "has recorded or transmitted the conversations which are later offered in evidence to prove the State's case." *Clariday v. State*, 552 S.W.2d at 768 (quoting *United States v. White*, 401 U.S. at 752). In *State v. Pate*, for example, the mother of a child rape victim was contacted by police and agreed to participate in a controlled phone call. The recording of the phone call was used as evidence. The circumstances were thus very similar to this case. In the context of conducting a "plain error" review of the trial court's evidentiary ruling, the appellate court restated its prior observation that "[t]he United States Constitution provides no protection for those who voluntarily offer information to a confidant." *State v. Pate*, 2011 WL 6935329, at *9 (quoting *State v. Bacon,* No. 03C01-9608-CR-00308, 1998 WL 6925, at *12 (Tenn. Crim. App. Jan. 8, 1998) (No Tenn. R. App. P. 11 application filed)). Although the appellate court described the mother as "a confidant[e] who was also a police agent," and who was "guided by law enforcement," the court found no breach of a clear and unequivocal rule of law because Mr. Pate "was not coerced into confessing by a law enforcement official." *State v. Pate*, 2011 WL 6935329, at *10.

---

[9](...continued)
police agent, such questioning does not amount to 'interrogation' in an 'inherently coercive' environment so as to require application of *Miranda*." *Illinois v. Perkins*, 496 U.S. at 300 (Brennan, J., concurring). In the case of Mr. Perkins, Justice Brennan believed that the State, which had "virtually complete control" over Mr. Perkins's prison environment, used an undercover agent to "barrage[]" him with questions until he confessed. In Justice Brennan's view, this "deliberate use of deception and manipulation by the police" raised "serious concerns that [Mr. Perkins's] will was overborne." Justice Brennan concluded: "It is open to the lower court on remand to determine whether, under the totality of the circumstances, [Mr. Perkins's] confession was elicited in a manner that violated the Due Process Clause." *Illinois v. Perkins*, 496 U.S. at 303 (Brennan, J., concurring).

The case of *State v. Bacon* involved a rape victim who agreed to make a police-controlled phone call to the defendant. "The Defendant misplaced his trust in the victim and volunteered incriminating statements." *State v. Bacon*, 1998 WL 6925, at *12. The Court of Criminal Appeals noted that neither the Fourth, Fifth, or Sixth Amendment protects a suspect who voluntarily offers information to a confidant, and upheld the trial court's decision to admit the statements into evidence. *State v. Bacon*, 1998 WL 6925, at *12 (citing *Clariday v. State*, 552 S.W.2d at 768; *Hoffa v. United States*, 385 U.S. at 302). The court made no finding concerning whether the victim was a state agent when she made the controlled call.

To summarize, the "misplaced trust" doctrine of *Hoffa* and *Branam* clearly applies to defendants' motions to suppress their confessions based on the Fifth Amendment or on the Fourth Amendment. *See United States v. Henry*, 447 U.S. 264, 272 (1980). As long as a suspect's incriminating statements are voluntary, it makes no constitutional difference whether the person who overhears the confession is an undercover police officer, an associate who later relays the confession to the authorities, or an associate who is already cooperating with the police and using a police recording or transmitting device. *See United States v. White*, 401 U.S. at 751-53 (discussing these scenarios). In circumstances like the one at issue here, courts need not expend their energies to determine the point at which a suspect's confidant becomes a government agent. Again, the constitution "gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent," even when "that same agent has recorded or transmitted the conversations which are later offered in evidence."[10] *United States v. White*, 401 U.S. at 752. As the United States Supreme Court cautioned, a person "contemplating illegal activities must realize and risk that his companions may be reporting to the police. . . . [T]he risk is his." *United States v. White*, 401 U.S. at 752; *see also Lopez v. United States*, 373 U.S. at 440 (finding "no invasion of constitutionally protected rights" and "no act of any kind which could justify the creation of an exclusionary rule" when an IRS employee wore a body wire and extracted incriminating statements from a hotel owner during a bribery sting operation). If the federal and state constitutions do not protect a suspect from being surreptitiously recorded by undercover law enforcement officers or by co-conspirators acting as informants, we likewise see no reason why the constitution should protect suspects from informants who happen to be their wives, family members, or former lovers.[11]

---

[10]To be clear, if L.S. had been a uniformed law enforcement officer rather than a confidante, her conduct might have run afoul of the Fifth Amendment and Article I, Section 9.

[11]To the extent that *State v. Ackerman*, 397 S.W.3d 617 (Tenn. Crim. App. 2012), suggests that Fifth Amendment protections apply in a "misplaced trust" case, it is overruled.

Just as the Fourth and Fifth Amendments do not protect criminal suspects from having their trust betrayed by police informants, neither does the Due Process Clause of the Fourteenth Amendment. As the United States Supreme Court made clear in *Colorado v. Connelly*, "The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause. . . . The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution." *Colorado v. Connelly*, 479 U.S. at 166.

Accordingly, courts need not worry themselves over whether an informant in a "misplaced trust" case was a private individual or a state agent. The exclusionary rule under the Fifth Amendment is a prophylactic measure designed to deter police misconduct. In "misplaced trust" cases, there is no police misconduct to be deterred. In the early stages of an investigation, it is constitutionally acceptable for the police to cooperate with friends or relatives of the victim or the suspect to see if these individuals can goad the suspect into confessing. *See United States v. Henry*, 447 U.S. 264, 272 (1980) ("[T]he Fifth Amendment has been held not to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion."); *see also Coolidge v. New Hampshire*, 403 U.S. at 488 (rejecting any policy of constitutional criminal procedure that would "discourage citizens from aiding to the utmost of their ability in the apprehension of criminals").[12]

## V.

Although the state and federal constitutions provide no protection to the suspect who "voluntarily" makes incriminating statements to a confidant who is or who becomes an agent of the police, in *Branam v. State*, we examined the totality of the circumstances surrounding

---

[12]Because Mr. Sanders had not yet been charged with a crime when he confessed, the voluntariness standards under the Sixth Amendment right to counsel are not implicated. *See United States v. Henry*, 447 U.S. 264, 270-73 (1980) (explaining that obtaining confessions using undercover agents after charges are filed is "quite a different matter" from doing so before charges are filed against a suspect); *State v. McCormick*, 778 S.W.2d 48, 53 (Tenn. 1989) (stating that the Sixth Amendment right to counsel is "applicable only when the government's role shifts from investigation to accusation" (quoting *Moran v. Burbine*, 475 U.S. 412, 430 (1986))). In *State v. Berry*, 592 S.W.2d 553, 556-61 (Tenn. 1980), this Court explained that it violates the Sixth Amendment right to counsel when, after judicial proceedings are initiated against a defendant, the government uses an informant to elicit information from the defendant in the absence of defense counsel. Once the right to counsel attaches to a defendant, law enforcement officers are not permitted "to do by ruse, trickery, deceit and deception that which it is not permitted to do openly and honestly." *State v. Berry*, 592 S.W.2d 561; *see also State v. Branam*, 855 S.W.2d at 569 (explaining that *State v. Berry* "was decided strictly on the basis of the Sixth Amendment's guarantee of the right to counsel," and not on the right against compelled self-incrimination).

Mr. Branam's statements to satisfy ourselves that they "were [not] the result of a will that had been 'overborne.'" *Branam v. State*, 855 S.W.2d at 569. We will now examine Mr. Sanders's statements in the same way.

In its order denying Mr. Sanders's motion to suppress, the trial court found "no evidence" that Mr. Sanders's "will was overborne" when he admitted his sexual misbehavior to L.S. The court reasoned that Mr. Sanders "clearly was not [physically confined], and the recording of the conversation speaks for itself. The recording demonstrates that though at times [L.S.] was stern, the tone of the discussion was conversational and [Mr. Sanders] freely gave his statements." The court noted that Mr. Sanders "was within several feet (estimates vary from one to ten feet) of his own vehicle and had the option to leave at any time. In fact, the body wire conversation concluded when [Mr. Sanders] thanked [L.S.] for talking before he entered his vehicle and drove off." The trial court therefore found that Mr. Sanders's statements "were freely made."

The Court of Criminal Appeals agreed that the "totality of the circumstances" revealed that [L.S.] did not coerce Mr. Sanders into making a confession and noted several facts to support its conclusion. L.S., the court said, "maintained a stern, yet non-argumentative tone." The conversation "occurred outdoors," meaning that Mr. Sanders "could not have reasonably felt confined." In fact, "the conversation occurred within a few feet of [Mr. Sanders's] vehicle, to which he held the keys, allowing him to leave at any time." Although the Court of Criminal Appeals noted that L.S. "admittedly lied to [Mr. Sanders] with regard to ceasing the investigation against him," her "tactics" did not overbear his will. *State v. Sanders*, 2012 WL 4841545, at *11. As we have already stated, a trial court's factual findings are generally binding upon this Court unless the evidence in the record preponderates against them, and the party prevailing in the trial court is entitled to the strongest legitimate view of the evidence. *State v. Echols*, 382 S.W.3d at 277.

The remaining question is whether Mr. Sanders's will was so severely overborne that his admissions were not the product of a rational intellect with freedom to choose. The state and federal constitutions provide no protection for those who *voluntarily* offer information to a confidant. *See Hoffa v. United States*, 385 U.S. at 302; *State v. Pate*, 2011 WL 6935329, at *9; *State v. Bacon*, 1998 WL 6925, at *12. The type of recording done in this case is also explicitly sanctioned as lawful in Tenn. Code Ann. § 39-13-601(b)(4)-(5) (2010 & Supp. 2013).

We find that Mr. Sanders's will was not overborne by L.S.'s questioning. We are dealing here with a prolonged, but not heated, conversation between two adults who lived together for years and had a son together. Mr. Sanders has not given us any reason to believe he was abnormally susceptible to coercion. We agree with the courts below that Mr. Sanders

was not in any way trapped during his conversation with L.S. and that he could have left at any time.  It was by his own choice that he continued talking for almost two hours.  He even thanked L.S. for the conversation.

There is little question that L.S.'s admonitions that she was prepared to summon the police and the media, along with her statements that she could "stop this thing" if Mr. Sanders cooperated accomplished their intended purpose.[13]  Nevertheless, the recording of the conversation reveals that Mr. Sanders maintained sufficient control of himself to be able to provide a version of the events intended to place his conduct in the best light possible.  Only slowly and haltingly did he reveal a series of increasingly inappropriate behaviors.  He attempted to blame alcohol and blame the victim for what had happened.  Far from taking responsibility for his actions, Mr. Sanders's version of events was directed toward defusing what he must have suspected A.S. had said about his conduct.

There is likewise little question that L.S. shaded the truth about the involvement of DCS and the police in the case.  However, she never unequivocally promised Mr. Sanders that she would stop the investigation if he admitted his guilt.  In fact, L.S. held out the possibility that she might turn the matter over the police and DCS even if Mr. Sanders cooperated.  While L.S. used effective tactics to elicit Mr. Sanders's tepid admissions, we do not find that her tactics overbore Mr. Sanders's will and effectively forced him to confess.  Under our deferential standard of review, we have no difficulty upholding the trial court's decision to deny Mr. Sanders's suppression motion.  The evidence does not preponderate against the trial court's conclusion that Mr. Sanders's confession was a voluntary choice.

## VI.

In conclusion, we have determined that the "legitimate independent motivation" test fashioned for constitutional challenges to searches and seizures made by private parties should not be used to determine the admissibility of incriminating statements elicited by private parties.  A statement made to a confidant, however, may still be inadmissible if, after considering the totality of the circumstances, the court determines that it was involuntary.  Having examined the totality of the circumstances surrounding Mr. Sanders's recorded statements, we find that Mr. Sanders's incriminating statements were admissible because L.S. did not overbear his will and force him to confess.  Accordingly, we affirm the judgments

---

[13]The State argues that Mr. Sanders could not have reasonably believed that the mother held the power to forestall a police investigation.  We disagree.  If the mother's falsehoods had been true, and the daughter had not already revealed the abuse to DCS, the mother could very well have hamstrung any potential investigation.

of the lower courts. In light of Mr. Sanders's indigency, the costs of this appeal are taxed to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE