IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 17, 2018 Session

**STATE OF TENNESSEE v. STEPHEN D. DEMPS**

**Appeal from the Criminal Court for Putnam County
No. 2014-CR-0436  Gary McKenzie, Judge**

_____

**No. M2017-00641-CCA-R3-CD**

_____

Stephen D. Demps, the Defendant, was convicted of five counts of rape of a child and four counts of aggravated sexual battery. The trial court merged counts six and eight, aggravated sexual battery, into counts two and four, rape of a child.[1] He received a total effective sentence of twenty-five years' incarceration. On appeal, he argues that: (1) his statement during his December 2013 interview with law enforcement should have been suppressed because he was in custody and was not informed of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); (2) his statement during his January 2014 interview with law enforcement should have been suppressed because he was coerced into confessing; (3) the trial court erred in denying his motion for mistrial after individuals spoke to the sequestered victim during trial; and (4) the State failed to properly submit a bill of particulars and he was prejudiced by this failure. After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Richard M. Brooks, Carthage, Tennessee, for the appellant, Stephen D. Demps.

---

[1] The trial court did not impose a sentence in counts six and eight. As our supreme court has stated, "[w]hen the jury returns guilty verdicts on multiple offenses that eventually will be merged, the best practice is for the trial court to impose a sentence on each count and reflect the sentence on the respective uniform judgment document. Because the documents also reflect the merger, the sentence has no immediate effect. However, in the event the greater conviction is reversed on appeal, the parties and the trial court are spared the necessity of an additional sentencing hearing." *State v. Berry*, 503 S.W.3d 360, 365 (Tenn. 2015).

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Bret Gunn and Beth Willis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural History

On May 7, 2014, the Putnam County Grand Jury indicted the Defendant on six counts of aggravated sexual battery. On March 2, 2015, the Putnam County Grand Jury issued a superseding indictment charging the Defendant with five counts of rape of a child and five counts of aggravated sexual battery. The Defendant filed a motion to suppress his statements to law enforcement on April 6, 2015.

*Suppression Hearing*

Detective Roger Cooper testified that he had worked for the Putman County Sheriff's Department ("PCSD") for over seventeen years. In December 2013, Detective Cooper investigated J.A.'s[2] complaint against the Defendant, J.A.'s great-uncle. On December 20, 2013, Detective Cooper called the Defendant and asked him to come to the PCSD for an interview ("the December interview"). The next day, the Defendant and his wife, Velma Demps, came to the PCSD to speak with Detective Cooper. Detective Cooper did not inform the Defendant of J.A.'s allegations prior to the interview. Detective Cooper stated that, during the December interview, the Defendant "didn't admit to what was being alleged, but did talk about some inappropriate contact." Detective Cooper made a video recording of the December interview. Detective Cooper did not tell the Defendant that he was under arrest or that he could not leave the PCSD, and the Defendant left at the end of the December interview. On January 14, 2014, Detective Cooper went to the Defendant's residence to interview the Defendant again ("the January interview"). Detective Cooper did not alert the Defendant or Mrs. Demps that he was coming to interview the Defendant. Mrs. Demps invited Detective Cooper to come inside the residence after he knocked on the door and introduced himself. Detective Cooper made an audio recording of the January interview with the Defendant.

On cross-examination, Detective Cooper testified that, during the December interview, the Defendant stated that J.A. had pushed up against him and that "he had pinched her on the boob to get her off of him . . . when they would wrestle around."

---

[2] It is the policy of this court to address minor victims by their initials to protect their identity. We intend no disrespect.

Detective Cooper did not recall whether he informed the Defendant that he recorded the December interview, but he stated that the video camera was visible in the corner of the interview room. Detective Cooper did not inform the Defendant of his *Miranda* rights at the December interview because the Defendant was not under arrest.

Detective Cooper stated that he went to the Defendant's house in January to photograph the Defendant's basement, where J.A. alleged the incidents had occurred. He agreed that his investigation was focused on the Defendant based on J.A.'s allegations. Regarding the January interview, Detective Cooper stated that the Defendant was friendly and answered his questions. He stated that, if the Defendant had asked him to leave the residence, he would have left. Detective Cooper explained that, while he was in the Defendant's basement, the Defendant voluntarily allowed him to look at the Defendant's computer files and search history. Detective Cooper agreed that he mentioned religion to the Defendant during the January interview, but he denied that he used the theme of religion to coerce a confession from the Defendant. He explained that, after he observed that the Defendant's basement was unfinished and did not look like an area where J.A. would have been wrestling with the Defendant, he asked the Defendant more questions. Detective Cooper agreed that he told the Defendant to do the "right thing" and discussed sexual urges with the Defendant.

The trial court denied the Defendant's motion to suppress. The trial court credited Detective Cooper's testimony and found that the Defendant freely and voluntarily came to the PCSD for the December interview. The trial court also found that Detective Cooper informed the Defendant that he was not under arrest and that the Defendant denied any criminal activity during that interview. The trial court found that the location of this interview at the PCSD weighed in favor of suppression. The trial court found that the majority of the December interview was not accusatory or confrontational in nature and that the Defendant drove himself to the interview, which weighed against suppression. Additionally, the trial court found that Detective Cooper did not restrain or limit the Defendant's movement during the December interview; Detective Cooper was not in uniform and did not sit between the Defendant and the door. The trial court found that the Defendant was aware that he was not under arrest and could leave at any time. Thus, the trial court concluded that "based upon the totality of the circumstances, a reasonable person in the [Defendant]'s position would not consider himself deprived of freedom of movement to a degree associated with a formal arrest during the interview conducted by Detective Roger Cooper on December 21, 2013."

The trial court found that, during the January interview, the Defendant consented to Detective Cooper coming into his house to further discuss the allegations, take photographs of the basement, and inspect his computer. The trial court found that Detective Cooper twice mentioned something to the effect that the Defendant needs to

tell the truth so that J.A. does not appear to be a liar. The Defendant then confessed to criminal behavior. The trial court noted that the Defendant was a healthy, intelligent, and articulate adult, which weighed against suppression of the Defendant's confession. The trial court also noted that there was no evidence that the Defendant had previous interaction with law enforcement, other than the December interview, which weighed in favor of suppression. The trial court found that, while Detective Cooper's questions "were definitely accusatory and definitely confrontational," Detective Cooper's questioning was not repeated or prolonged, which weighed against suppression. The trial court found that Detective Cooper did not promise anything in exchange for a confession, which weighed against suppression. The trial court found that there was no evidence that the Defendant was deprived of food, sleep, or medical attention, which weighed against suppression. The trial court found that Detective Cooper's statements about religion and making J.A. out to be a liar were not coercive. The trial court concluded that "the statement of the Defendant to Detective . . . Cooper on January 14, 2014[,] was freely and voluntarily given" and that "the [s]tatement was not extracted by any sort of threat, or violence, nor obtained neither by any direct or implied promises nor by the exertion of any improper influence."

*Jury Trial*

Detective Cooper testified that, in 2010, he became a detective for the PCSD in the Crimes Against Children Division. He explained that he worked with the Child Advocacy Center ("CAC")[3] in Cookeville. Detective Cooper stated that J.A., her mother, and a family friend came to the PCSD on December 14, 2013, and filed a report; J.A. was twelve years old at the time. J.A. was interviewed at the CAC, and Detective Cooper observed this interview from another room. He then asked the Defendant to come to the PCSD for the December interview. The Defendant and Mrs. Demps came to the PCSD on December 20, 2013, and Detective Cooper interviewed the Defendant. Detective Cooper went to the Defendant's residence on January 14, 2014 to conduct a second interview. According to Detective Cooper, the Defendant demonstrated his sexual contact with J.A. in the basement during the second interview. Detective Cooper then asked the Defendant if he had penetrated J.A.'s vagina with his tongue. Detective Cooper explained that, based on his years of experience, he knew that the Defendant was withholding information by not responding to or denying the allegation. Detective Cooper stated that the Defendant "had a look on his face of, like he was going to say something[,]" so Detective Cooper said that the Defendant's expression implied that the Defendant's answer was yes. Detective Cooper also asked the Defendant if he kissed J.A.'s vagina, and the Defendant nodded in the affirmative.

---

[3] Detective Cooper explained that the CAC was "a non[-]threatening environment" where children were forensically interviewed.

On cross-examination, Detective Cooper stated that, during her interview at the CAC, J.A. said that the Defendant touched her over her clothes. He explained that he never personally interviewed J.A., but he spoke with J.A.'s mother, K.M.,[4] about the allegations. Detective Cooper agreed that, after the Defendant admitted he had sexual contact with J.A., Detective Cooper asked the Defendant if he felt guilty. Detective Cooper stated that the Defendant seemed remorseful and said he was ashamed of his conduct but also deflected blame.

J.A. testified that, in December 2013, she was twelve years old. She stated that she spent time at the Defendant's residence, including spending the night. J.A. said that her siblings also went to the Defendant's residence, but she explained that sometimes she went by herself. The Defendant and Mrs. Demps also transported J.A. to and from school on occasion. She explained that she liked to watch videos of hair and makeup tutorials on the computers in the Defendant's basement. J.A. stated that the Defendant began touching her vagina with his fingers and mouth in the basement of his residence when she was eight years old. The Defendant told her not to tell anyone about the touching. J.A. explained that the Defendant put his fingers and tongue inside her vagina and moved them around. She stated that she generally wore shorts and a T-shirt when the Defendant penetrated her. She explained that she would be sitting at the computer, and the Defendant would sit next to her and touch her. J.A. stated that the Defendant took off her shorts or made her stand in order to penetrate her. She also stated that the Defendant put his hand up her shirt and touched her breasts.

J.A. described an incident that occurred in the living room of the Defendant's residence. She was sitting on the couch watching TV, and the Defendant penetrated her vagina with his fingers and tongue. J.A. testified regarding another incident that occurred after the Defendant and Mrs. Demps went to dinner with J.A. and her siblings at a Golden Corral restaurant. Earlier that day, J.A. was in the basement of the Defendant's residence with the Defendant. J.A. stated that the Defendant penetrated her vagina with his fingers and tongue. J.A. stated that, on the last occasion that her mother arranged for J.A. to spend the night at the Defendant's residence, she cried and told her mother that she did not want to go. She testified that the Defendant penetrated her on this occasion with his fingers and tongue. J.A. estimated that the Defendant penetrated her with his fingers and tongue at least thirty times.

J.A. stated that, while the Defendant was committing the offenses, her siblings were usually in the upstairs of the residence, and Mrs. Demps was either upstairs or not in the residence. J.A. stated that she told her neighbor, Rose Clark, about the Defendant's

---

[4] We will refer to J.A.'s mother by her initials to protect J.A.'s identity. We intend no disrespect.

conduct, and J.A. then told her mother. She explained that she did not inform an adult of the abuse until she told Ms. Clark because she was scared and embarrassed. After J.A. informed her mother of the Defendant's offenses, J.A. and her mother went to the PCSD and spoke with a deputy. Later, J.A. spoke with a woman at the CAC. J.A. admitted that she did not tell the woman at the CAC all the facts about the Defendant's offenses; J.A. told the woman that the Defendant had touched her on the outside of her clothing because she was embarrassed and believed that she would get into trouble.

On cross-examination, J.A. testified that two individuals[5] came into the room where she was sequestered prior to her testimony. J.A. stated that these individuals did not discuss the case with her.

Deputy Matthew Roberts testified that he had worked for the PCSD for eleven years. On December 14, 2013, Deputy Roberts spoke with J.A., her mother, and Ms. Clark. Deputy Roberts generated a report based on the information that J.A. shared. He stated that J.A. was very emotional while she described the Defendant's offenses.

At the conclusion of the State's proof, the State elected to proceed on five counts of rape of a child based on the Defendant's oral and digital penetration of J.A. during her visits to the Defendant's home. The State also proceeded on four counts of aggravated sexual battery based on the Defendant's sexual touching of J.A.'s vagina during her visits to the Defendant's home. The State dismissed count ten of the indictment, aggravated sexual battery. The jury found the Defendant guilty as charged on the remaining counts. The trial court merged count six, aggravated sexual battery, into count two, rape of a child, and merged count eight, aggravated sexual battery, into count four, rape of a child. The trial court sentenced the Defendant to a total effective sentence of twenty-five years' incarceration. The Defendant filed a timely motion for new trial, which the trial court denied. The Defendant now timely appeals.

## II. Analysis

*Motion to Suppress*

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable

---

[5] It is unclear from the record who these individuals were. J.A. was never asked to identify them by name. It appears, however, that one of the individuals may have been her sister.

inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005).

## *Suppression of the December Statement*

The Defendant asserts that the trial court should have suppressed the December statement because he was in custody and was not informed of his *Miranda* rights. The Defendant asserts that Detective Cooper restricted his movement during the interview by shutting the door to the interview room and occasionally leaning in towards the Defendant during the interview. The Defendant also argues that Detective Cooper "solicit[ed] information from [the Defendant] by invoking church, Christianity and the theories of temptation, a subject that is very personal for most people."

Both the United States and Tennessee Constitutions protect against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In order to protect criminal defendants from self-incrimination, the United States Supreme Court has ruled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444; *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001). As part of those safeguards, police are required to inform persons who are subjected to custodial interrogation: (1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired. *See Miranda*, 384 U.S. at 444.

Our supreme court has stated that the test to determine whether a defendant was in custody is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). Our supreme court set out the following non-exclusive factors to assist in this determination:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's

suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* (internal citations omitted). The Supreme Court of the United States has recognized that "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

At the suppression hearing, Detective Cooper stated that the video camera was visible in the corner of the interview room and noted that the Defendant and Mrs. Demps voluntarily came to the PCSD to speak with him. Detective Cooper did not inform the Defendant of his *Miranda* rights at the December interview because the Defendant was not under arrest. The trial court concluded that, "based upon the totality of the circumstances, a reasonable person in the [Defendant]'s position would not consider himself deprived of freedom of movement to a degree associated with a formal arrest during the interview conducted by Detective Roger Cooper on December 21, 2013."

We agree with the trial court. The Defendant voluntarily agreed to come to the PCSD to speak with Detective Cooper. Detective Cooper was not in uniform during the interview, and the Defendant sat between Detective Cooper and the door to the interview room. During the interview, both the Defendant and Detective Cooper appeared to be relaxed and friendly, and Detective Cooper's questions concerning J.A.'s allegations were not overly accusatory or confrontational.[6] We conclude that the trial court properly denied the Defendant's motion to suppress the December statement.

### Suppression of the January Statement

The Defendant contends that the trial court erred by not suppressing his statement made during the January interview. The Defendant argues that Detective Cooper coerced the Defendant to confess because Detective Cooper brought up themes of religion, men's sexual urges, and calling J.A. a liar and a criminal during the interview.

The Fifth Amendment to the United States Constitution provides in pertinent part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused shall not be compelled

---

[6] Both the video recording of the December interview and the audio recording of the January interview are included in the record on appeal.

to give evidence against himself." Tenn. Const. art. I, § 9. The test of voluntariness for confessions under the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment. *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

The voluntariness of a confession is a question of fact. *State v. Sanders*, 452 S.W.3d 300, 305 (Tenn. 2014) (citing *Walton*, 41 S.W.3d at 81; *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *Self v. State*, 65 Tenn. (6 Baxt.) 244, 253 (1873)). The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. *Id.* (citing *State v. Stamper*, 863 S.W.2d 404, 405 (Tenn. 1993)).

A court determining voluntariness must examine the totality of the circumstances surrounding the giving of a confession, "both the characteristics of the accused and the details of the interrogation." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Circumstances relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)) (alteration in original) (emphasis omitted).

In evaluating whether a statement was given voluntarily, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." *Climer*, 400 S.W.3d at 568 (citing *Dickerson*, 530 U.S. 428 at 433-35; *Smith*, 933 S.W.2d at 455). A suspect's subjective perception alone is insufficient to support a conclusion of involuntariness of a confession. *Smith*, 933 S.W.2d at 455 (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary[.]" *Brimmer*, 876 S.W.2d at 79.

At the suppression hearing, Detective Cooper stated that he went to the Defendant's house for the January interview to photograph the Defendant's basement, where J.A. alleged the incidents occurred. Detective Cooper stated that the Defendant was friendly and answered his questions. He stated that, if the Defendant had asked him to leave the residence, he would have left. Detective Cooper explained that the Defendant voluntarily allowed him to look at the Defendant's computer files and search history. He agreed that his investigation was focused on the Defendant based on J.A.'s allegations, that he mentioned religion to the Defendant during the January interview, and that he told the Defendant to do the "right thing" and discussed sexual urges with the Defendant. The trial court found that Detective Cooper's statements about religion and making J.A. out to be a liar were not coercive. The trial court concluded that "the statement of the Defendant to Detective Roger Cooper on January 14, 2014 was freely and voluntarily given" and that "the [s]tatement was not extracted by any sort of threat, or violence, nor obtained neither by any direct or implied promises nor by the exertion of any improper influence."

We conclude that the trial court properly denied the Defendant's motion to suppress the January statement. The evidence reflects that, while Detective Cooper went to the Defendant's residence with the purpose of further investigating J.A.'s allegations, the Defendant voluntarily allowed Detective Cooper to come into his residence, take photographs of the basement, inspect the computers, and ask questions. Detective Cooper's questions were frank but not coercive. Detective Cooper's statement that J.A. was being portrayed as a liar was an inference based on J.A.'s allegations and the Defendant's denial of those allegations during the December interview. Additionally, the recording of the January interview reflects that the Defendant brought up his faith first and stated that he had been praying about how to deal with his conduct. It was reasonable for Detective Cooper to expand on this theme in his interview with the Defendant. We conclude that the trial court properly denied the Defendant's motion to suppress his statement made during the January interview.

*Motion for Mistrial*

The Defendant alleges that the trial court should have granted his motion for mistrial because "it [wa]s apparent that information and testimony was going from the witness stand back to the witness holding area" in violation of Tennessee Rule of Evidence 615. The State argues that Rule 615 was not violated, the Defendant cannot establish that he was prejudiced by J.A.'s interaction with other individuals, and the Defendant has not established the manifest necessity for a mistrial. We agree with the State.

- 10 -

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Id.* This court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

Tennessee Rule of Evidence 615 states the following, in pertinent part:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness.

Tenn. R. Evid. 615. The purpose of this rule is "to prevent one witness from hearing the testimony of any other witness and adjusting his testimony . . . ." *Smith v. State*, 554 S.W.2d 648, 651 (Tenn. Crim. App. 1977). The decision to sequester a witness is left to the sound discretion of the trial court, and we will not reverse the trial court's decision absent evidence that the moving party was prejudiced. *State v. Chadwick*, 750 S.W.2d 161, 166 (Tenn. Crim. App. 1987). Trial courts also have discretion in determining whether to impose a sanction on a party that violates the sequestration rule. *State v. Moffett*, 729 S.W.2d 679, 681 (Tenn. Crim. App. 1986). Sanctions can include declaring a mistrial, ruling for or against a party on a particular issue, holding the violating witness in contempt, "allowing the offender to testify but subjecting her to cross-examination about her violation, the testimony she heard, and the impact it may have had on her testimony[,]" instructing the jury to consider the violation when assessing the offending witness' credibility, or exclusion of the witness. *State v. Jordan*, 325 S.W.3d 1, 41-42 (Tenn. 2010) (internal citations omitted). However, declaring a mistrial is a drastic measure that should be reserved for intentional violations of Rule 615. *See id.* at 41.

Prior to opening statements, the State asked the trial court to excuse witnesses from the courtroom under Rule 615. During Detective Cooper's direct examination, the Defendant asked the trial court to instruct courtroom spectators to refrain from visiting J.A. and talking to her about testimony. The trial court gave the following order to courtroom spectators:

So, what I'll say to any witness that's in the courtroom, or even just anybody watching what is happening in the courtroom, regardless of what side you are on, and I know there's some here that are, I guess, sitting on the side of the [S]tate, that anything you hear in this courtroom from the witness chair, you cannot, and by order of the [c]ourt, you cannot talk to any potential witness, whether it be [J.A.] or someone else, about what you are hearing inside of this courtroom.

The following exchange between the trial court and defense counsel occurred during the Defendant's cross-examination of Detective Cooper:

[TRIAL COURT]: . . . There's been some indication made to me, the court personnel . . . around this trial have indicated there's a high volume of traffic that's coming and going . . . in and out of this courtroom. And whenever they get in here, I'll talk specifically to all the witnesses. Some individuals that have been sitting in the courtroom watching it have left, and they've walked back and walked into areas where certain witnesses are being kept. . . . I do not know what is being said. I don't know that anybody is talking to anybody about potential testimony. But I want to make sure I bring everyone in here, and I want to make sure they understand what is going on here today, and make sure that they aren't discussing what's being said.

. . . .

[DEFENSE COUNSEL]: I think you need to bring the witnesses in and just ask them about, if they know anything about the testimony in here, either that or move for a mistrial. And I think the tampering with the witnesses is definitely grounds for a mistrial. I don't care if they're young and don't understand, or anything of that nature. This man deserves a fair trial.

. . . .

[TRIAL COURT]: . . . I'm not going to ask questions. I appreciate what you're saying. I'm not going to ask questions of any of the potential witnesses. They're not under oath. . . . If on cross-examination there wants to be, on either party, a question asked of a witness, "Has anyone discussed with you today any substance of any testimony that has happened

at the trial," that's a proper question.  They'll be under oath.  We'll see what they say.  That would be the same as if I did it.

So, I'm going to allow those questions on cross-examination from both parties, and we'll see what they say, and depending on that, you may want to renew your motion for a mistrial.  I'm going to deny it right now.

. . . .

[TRIAL COURT]: So, we have everybody here, so I'm going to go ahead and take care of this.  I want to say this to each and every individual who is a potential witness, or anybody in this courtroom, who is a family member, or a friend who is here in support of one side or the other, it does not matter to me which side it is, I am putting an order down, two things: Number 1, if you are in here watching this trial, you're to stay in here watching this trial.  . . . [C]ontinued getting up and leaving and walking out is not going to happen.  If I see that that happens a number of times, you will not come back in the courtroom, whoever you are.  It will not happen.

Number 2, I'm putting an order down, there is to be no discussion of testimony that happens in this courtroom.  I don't care if you're a witness or not.  If you are in this room and you are listening to this trial, and then you have a conversation with a witness, or a potential witness, where you are discussing what is taking place at this trial, that is a contempt of court.  Not only will you be fined, but I will take you into custody.  I don't care what side you're on.  It doesn't matter.  This is going to be a fair trial. That's what's going to happen here today.  So, I say that to both sides.

On cross-examination, J.A. testified that two individuals came into the room where she was sequestered prior to her testimony.  J.A. stated that these individuals did not discuss the case with her.

We conclude that the trial court properly denied the Defendant's motion for mistrial.  When the Defendant cross-examined J.A., she testified that the two individuals who visited her did not discuss witness testimony or the trial.  Thus, the Defendant has not established that Rule 615 was violated.  Additionally, as the State notes, the Defendant has not established how he was prejudiced by J.A.'s interaction with the two individuals.  The Defendant only offers a conclusory allegation that J.A. changed her testimony based on her interaction with two individuals and does not specify what aspects of her testimony changed.  The Defendant had the opportunity to ask J.A. on cross-examination whether her testimony changed based on her interaction with the two

- 13 -

individuals, but he did not. Regardless, there is no evidence that J.A.'s testimony changed based on her interaction with the two individuals while she was sequestered. Further, the Defendant has not established a manifest necessity for a mistrial. The Defendant had the opportunity to cross-examine J.A. about her interaction with other individuals while sequestered, as well as her interactions with the State prior to trial and why her statement to the PCSD differed from her statement given at the CAC. The trial court properly concluded that a mistrial was not warranted and instead instructed courtroom spectators to refrain from interacting with sequestered witnesses. *See State v. Gregory Lynn Hill*, No. E2008-02521-CCA-R3-CD, 2009 WL 3711993, at *9-10 (Tenn. Crim. App. Nov. 6, 2009) (affirming the trial court's denial of mistrial when defense counsel had the opportunity to cross-examine witnesses about possible violation of sequestration of witnesses), *perm. app. denied* (Tenn. Apr. 14, 2010); *see also Rodney Lee Scott*, No. E2015-01772-CCA-R3-CD, 2017 WL 568547, at *6-7 (Tenn. Crim. App. Feb. 13, 2017) (affirming trial court's denial of mistrial when defense counsel cross-examined witnesses who violated Rule 615 and the Defendant was not prejudiced by the violation), *perm. app. denied* (Tenn. May 18, 2017). The Defendant is not entitled to relief on this ground.

*Motion for Bill of Particulars*

The Defendant lastly asserts that the trial court erred in allowing the State to submit a vague bill of particulars. He argues that the bill of particulars did not "provide[] [him] with information about the details of the charge against him that [wa]s necessary to the preparation of his defense" and that he was consequently unable to prepare an alibi defense.

"On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charge." Tenn. R. Crim. P. 7(c). The purpose of a bill of particulars is threefold: (1) to provide the "defendant with information about the details of the charge against him if this is necessary to the preparation of his defense"; (2) to assure that the defendant has the opportunity to "avoid prejudicial surprises at trial"; and (3) to preserve the defendant's plea against double jeopardy. *State v. Sherman*, 266 S.W.3d 395, 408-09 (Tenn. 2008). A bill of particulars is not a discovery device. *Id.* at 409. Instead, "the purpose of a bill of particulars is to alert criminal defendants as to the how the State will proceed with the litigation. The purpose is not to lock the State into a specific theory of prosecution." *Id.* "[A] conviction must be reversed if trial testimony establishes that the [S]tate had in its possession, either actually or constructively, additional information that could have helped pinpoint the nature, time, or place of the offense, and withheld that information from the defendant." *State v. Byrd*, 820 S.W.2d 739, 742 (Tenn. 1991).

- 14 -

Prior to trial, the Defendant filed a motion for a bill of particulars. On August 18, 2015, the State filed a response, which stated the following:

> 1. Counts 1-5 refer to incidents of sexual penetration occurring on dates from September 2009 through December 2013. These counts refer to the [D]efendant's insertion of his tongue or fingers into the genital opening of the victim.
>
> 2. Counts 6-10 refer to incidents of sexual contact occurring on dates from September 2009 through December 2013. These counts refer to the [D]efendant's touching of the victim's genital area with his tongue or fingers.
>
> 3. All of these incidents occurred at [the Defendant's residence] in Cookeville, Tennessee.
>
> . . . .
>
> 5. The Assistant District Attorney will meet with the victim in this case approximately two months before the trial date. At that point, the victim will be asked to describe specific instances and surrounding circumstances that would distinguish one incident from another. The State will update this Bill of Particulars accordingly at that time, as well as any additional specificity that may occur leading up to the trial.

At a pre-trial motion hearing on February 2, 2016, the State asserted that, at that time, it did not have any specific information from J.A. to narrow down the date range of the alleged offenses. The State agreed to interview the victim again and pass on any information regarding the dates or date ranges of the alleged incidents to the Defendant at least six weeks before trial. On February 25, 2016, the State filed an amended response to the Defendant's motion for a bill of particulars, which stated the following:

> 1. The State intends to present evidence about the following specific acts:
>
> > A. The last time that the victim spent the night at the residence of the [D]efendant was over a period of two days. On each day the [D]efendant penetrated the victim's vagina with his tongue and his fingers. This

occurred in 2011 and is discussed by the [D]efendant in his statement.

B. The incidents normally occurred in the basement, but the victim would describe one incident that occurred in the living room. On this occasion the [D]efendant penetrated the victim's vagina with his tongue and fingers. The State cannot narrow the time frame for this incident.

C. On one occasion, the victim recalls an incident that occurred during the day. . . . [A]fterwards the [D]efendant and his wife along with the victim and her siblings . . . ate supper at the Golden Corral. On this occasion[,] the [D]efendant penetrated the victim's vagina with his tongue and fingers. The State cannot narrow the time frame for this incident.

2. All of these incidents occurred at the [D]efendant's residence.

At a motion hearing on May 18, 2016 before jury selection, the Defendant argued that the State had still failed to file a sufficient bill of particulars and asked the trial court to dismiss the charges against him. The trial court found that the State had responded to the Defendant's motion and provided as many details as the State had been able to obtain from J.A. The trial court declined to dismiss the charges against the Defendant for lack of specificity.

We conclude that the Defendant had adequate notice of the charges against him. The Tennessee Supreme Court has previously recognized that "young children who are victims of child abuse may not be able to testify that abuse occurred on a specific date, or provide extensive details in this regard." *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999). Here, in its first response to the Defendant's motion for a bill of particulars, the State narrowed the time frame of the Defendant's alleged offenses to September 2009 through December 2013; the State alleged how the Defendant accomplished the offenses and where the offenses occurred. The State later alleged three specific incidents of rape of a child in its second response, and J.A. testified about these three incidents during her direct examination. The Defendant's confession to Detective Cooper during the January interview also aligned with the information contained in the State's responses to the Defendant's motion for a bill of particulars. Thus, there is no evidence that the State withheld evidence that would have assisted the Defendant in preparing an alibi defense.

- 16 -

The Defendant is not entitled to relief on this ground.[7] *See State v. Henry Floyd Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545, at *13 (Tenn. Crim. App. Oct. 9, 2012) (concluding that defendant had adequate notice of allegations when the bill of particulars narrowed the offense dates to a period of time between September 1, 2005, and January 25, 2008), *aff'd on other grounds by State v. Sanders*, 452 S.W.3d 300 (Tenn. 2014); *see also State v. Jonathan Mitchell Grimes*, No. W2014-00786-CCA-R3-CD, 2015 WL 3929694, at *13 (Tenn. Crim. App. June 26, 2015) (concluding that there was "no evidence that the State possessed, either actually or constructively, additional information that could have helped pinpoint the time of the offense, and withheld that information from the defendant"), *no perm. app. filed*.

### III. Conclusion

Based on the aforementioned reasons, we conclude that the trial court properly denied the Defendant's motions to suppress his statements and his motion for mistrial. We also conclude that the State's responses to the Defendant's motion for a bill of particulars gave the Defendant sufficient notice of the allegations against him. Thus, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

[7] Although the Defendant did not raise an issue as to the State's election of offenses, this court reviewed the State's election and the election corresponded to the State's responses to the Defendant's motion for a bill of particular.