IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 12, 2020 Session

**HENRY FLOYD SANDERS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2008-D-3408       Cheryl A. Blackburn, Judge**

**No. M2019-00397-CCA-R3-PC**

In 2011, a Davidson County jury convicted the Petitioner, Henry Floyd Sanders, of five counts of aggravated sexual battery and four counts of rape of a child, and the trial court sentenced him to forty years of incarceration. The Petitioner appealed his convictions to this court, and this court and our supreme court affirmed the judgments. *State v. Sanders*, 452 S.W.3d 300 (Tenn. 2014); *State v. Henry Floyd Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App., at Nashville, Oct. 9, 2012). Subsequently, the Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel, which the post-conviction court denied after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jessica M. Van Dyke, Nashville, Tennessee, for the appellant, Henry Floyd Sanders.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Byron Pugh, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts and Background**

This case originates from the Petitioner's rape of the minor victim, his girlfriend's daughter, in the home they shared. Based on these events, a Davidson County grand jury indicted the Petitioner for six counts of aggravated sexual battery and four counts of rape of a child.

## A. Trial

Our supreme court summarized in its opinion the facts presented at trial:

> In 2003, [the Petitioner] met and began a relationship with L.S., [the victim's mother], when they were both living in southern Mississippi. At some point, [the Petitioner] and L.S. began living together, along with L.S.'s five-year-old daughter, [the victim]. In 2005, [the victim's mother] gave birth to [the Petitioner's] son. Following the devastation of the Gulf Coast by Hurricane Katrina in 2005, [the Petitioner], [the victim's mother], and the two children moved to Nashville.

> Both [the Petitioner] and [the victim's mother] were employed at the same big box retail store in Nashville. [The victim's mother] worked a night shift and was home with the children during the day. [The Petitioner] worked a day shift and took care of the children at night while [the victim's mother] was working. During the evenings when [the victim's mother] was absent, [the Petitioner] began touching [the victim] inappropriately. These acts escalated over time to the point where [the Petitioner] regularly engaged in sexual conduct with [the victim.]

> [The Petitioner] and [the victim's mother] ended their relationship in January 2007. [The Petitioner] moved into an apartment, and [the victim's mother] and the children moved into a duplex. The children occasionally spent the night with [the Petitioner] at his apartment. At this point, [the victim], who was in the third grade, began seeing the school guidance counselor. [The victim] later testified that she had developed a "real bad anger problem," and wanted advice regarding conflicts with her mother. During her second visit with the counselor, [the victim] revealed that she was "getting sexually abused" by [the Petitioner.] Based on [the victim's] statements, the Metropolitan Police Department and the Department of Children's Services ("DCS") started an investigation.

> When [the Petitioner's] conduct first came to light, [the victim's mother] was "in denial" and "didn't want to . . . believe that the father of my son had done these things to my daughter." After [the victim] revealed additional details about [the Petitioner's] conduct, [the victim's mother] decided that she wanted to talk with [the Petitioner] face-to-face "for closure purposes" and to find out whether [the Petitioner] would admit to engaging in the conduct described by [the victim]. Accordingly, she agreed with Detective Josh Mayo's suggestion that she wear a concealed

microphone during her conversation with [the Petitioner].

On April 24, 2008, [the victim's mother] and [the Petitioner] talked for one hour and forty-four minutes in the front yard of her home. [The Petitioner] drove there in his car, and he stood near his car the entire time. [The victim's mother] was wearing a concealed microphone, and Detective Mayo and another officer were listening to and recording the conversation in an unmarked police car parked nearby. The children were in the house and did not participate in the conversation. Detective Mayo called [the victim's mother] three to five times during the conversation to encourage her to stay calm and to remind her to ask [the Petitioner] about some of the important details that [the victim] had provided in her interview with DCS.

[The victim's mother's] tone during her discussion with [the Petitioner] was, at times, stern, but it was never heated or argumentative. She told him that "there are a lot of allegations right now about this" and that "I already know what happened; I need to hear it from you." Even though both DCS and the police had already started their investigations, [the victim's mother] led [the Petitioner] to believe that she could prevent the matter from going any further by not taking [the victim] to an upcoming interview with DCS. She told [the Petitioner] that she had "the power to stop this thing" but that she needed [the Petitioner] to "be honest . . . about what happened." [The victim's mother] also told [the Petitioner] that "[t]his is in my hand . . . I need closure to this, that's all I want."

[The Petitioner] initially told [the victim's mother] that "[i]t did not happen." He denied sexually abusing [the victim] and insisted that he could not have raped [the victim] because he was impotent as a result of diabetes and colon cancer. He attributed [the victim's] sexual knowledge to the facts that the children had seen him naked when he was getting out of the shower and that [the victim] had entered the bathroom one time while he was masturbating. [The victim's mother], clearly frustrated with these answers, responded that "[y]ou might as well just flat out be honest with me." She also warned [the Petitioner] that if he did not tell the truth, he would see his face on the television news.

Eventually, [the Petitioner] conceded that he first started touching [the victim] inappropriately as she was getting out of the bathtub. [The Petitioner] also admitted that when he was drinking, he and [the victim] would "wrestle" when she was wearing only her underwear or sometimes when she was naked. He also admitted that he had "laid on" [the victim] in

an inappropriate way when they were wrestling and that he had touched [the victim's] "private area" on occasions when she was sitting on his lap and when they were wrestling.

Later in the conversation, [the Petitioner] told [the victim's mother] he touched [the victim] inappropriately when she crawled on top of him and that occasionally [the victim] would kiss him on the mouth. He said that [the victim] was "very curious" and that she initiated sexual activities with him, but that he never went so far as to honor the nine-year-old's requests to have sexual intercourse.

As the conversation wound down, [the Petitioner] asked [the victim's mother] for mercy and thanked her for talking with him. The conversation ended with [the victim's mother] telling [the Petitioner] that she would "think about" what she would do next. [The Petitioner] replied, "thank you for talking anyway."

One month later, [the victim's mother] placed a telephone call to [the Petitioner] while the police recorded their conversation. [The Petitioner] admitted nothing during their conversation. Thereafter, the police requested [the Petitioner] to talk with them. During the meeting on May 20, 2008, at the Nashville Criminal Justice Center, [the Petitioner] admitted nothing and declined to provide a DNA sample.

On October 21, 2008, a Davidson County grand jury indicted [the Petitioner] on six counts of aggravated sexual battery in violation of Tenn. Code Ann. § 39-13-504 (2010) and four counts of rape of a child in violation of Tenn. Code Ann. § 39-13-522 (2010 & Supp. 2013). [The Petitioner] entered a not guilty plea and later moved to suppress his recorded conversation with [the victim's mother]. He argued that the admission of the recording violated due process and his constitutional privilege against self-incrimination. He insisted that [the victim's mother] was acting as an agent of the State when she talked with him on April 24, 2008 outside her home and that [the victim's mother] had overcome his will during that conversation and coerced him into making a false confession.

The Criminal Court for Davidson County held a suppression hearing on September 29, 2010. Both [the victim's mother] and Detective Mayo testified. Following the hearing, the trial court declined to suppress [the Petitioner's] statements. The trial court decided that even though [the victim's mother] was cooperating with the police, "she had an independent

motivation to participate in the body wire," and thus did not qualify as a government agent. The court found it "completely reasonable that a parent would be independently motivated to confront their child's alleged molester to try to find out what happened to their child." Even if the [victim's] mother qualified as a state agent, the court said, the [victim's] mother's statements to [the Petitioner] during their conversation did not coerce [the Petitioner] into confessing against his will.

[The Petitioner's] trial commenced on January 31, 2011. [The victim] testified in detail about how [the Petitioner] had sexually molested her. During Detective Mayo's testimony, the State introduced the conversation between [the victim's mother] and [the Petitioner] that was recorded on April 24, 2008. Because of technical problems, the jury heard only the first half of the actual recording. Detective Mayo read the remainder of the recording to the jury using a transcript of the conversation.

Prior to closing arguments, the trial court granted [the Petitioner's] motion for a judgment of acquittal on one of the aggravated sexual battery counts. The jury later found [the Petitioner] guilty of all the remaining counts—five counts of aggravated sexual battery and four counts of rape of a child. On March 23, 2011, the trial court denied [the Petitioner's] motion for a new trial and imposed an effective forty-year sentence.

[The Petitioner] appealed, and the Court of Criminal Appeals upheld his convictions and sentence. *State v. Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App. Oct. 9, 2012).

*Sanders*, 452 S.W.3d 303-05. Our supreme court affirmed the judgments. *Id.*

## B. Post-Conviction Proceedings

The Petitioner filed a *pro se* petition for post-conviction relief, which was later amended twice by appointed counsel, alleging that he had received the ineffective assistance of counsel. He contended that trial counsel ("Counsel") was ineffective for failing to: (1) obtain an expert witness on false confessions; (2) object to the testimony of the school counselor; (3) investigate another male adult living with the victim; (4) cross-examine the victim about the delay of her disclosure or present this issue to the jury; (5) object to the testimony of expert Hollye Gallion on multiple bases; (6) object to the State's closing argument on multiple bases; (7) interview the Petitioner's ex-wife, Angela Roberts; (8) present witnesses at the Petitioner's sentencing hearing; and (9) present certain arguments on direct appeal.

5

The following evidence was presented at a hearing on the petition: Professor Alan Hirsch testified that he was a criminal justice professor at Williams College and specifically focused on the area of interrogations and confessions. He stated that he was in the class of experts "whose principal expertise is in the interrogation methods that contribute to false confessions." Professor Hirsch was admitted as an expert in this area. He testified generally to the published literature on "false confessions" and the conditions present when a confession is proven as false. He testified about the "Reid method" of interrogation, which often leads to "false confessions." He also testified to the methodology used to establish the reliability of a confession. For the Petitioner's case, Professor Hirsch prepared a sworn expert affidavit based on reading the transcript of the recorded conversation between the Petitioner and the victim's mother during which the Petitioner admitted to the sexual abuse. Based on his reading of the transcript of their conversation Professor Hirsch identified examples of "confrontation" and "minimalization" on the part of the victim's mother that occurred throughout their conversation and could have led the Petitioner to falsely confessing to the crimes. He testified about several more examples in their conversation when the victim's mother said things that would have pushed the Petitioner into falsely confessing.

On cross-examination, Professor Hirsch acknowledged that his affidavit conceded that the victim's mother was not a member of law enforcement. He agreed that he could not state with certainty that the Petitioner's confession was unreliable or false.

Counsel testified that she worked at the Public Defender's Office and was appointed to represent the Petitioner. She stated that she did not consult an expert regarding false confessions in child sexual abuse cases prior to the Petitioner's trial. Counsel could not remember if any other male adults were living in the victim's home at the time of the crimes. Counsel attempted to speak to Angela Roberts, with whom the Petitioner shared a daughter, but Ms. Roberts was uncooperative.

Counsel recalled that a nurse, Hollye Gallion, from Our Kid's counseling center testified at trial about her interview with the victim. Counsel testified that she watched a video recording of the victim's forensic interview with Ms. Gallion. Counsel recalled a discussion with the Petitioner about whether he would testify; he ultimately decided not to.

On cross-examination, Counsel testified that she had been practicing law for twenty-two years at the time of the Petitioner's trial. Her defense strategy was first to get the Petitioner's recorded conversation with the victim's mother suppressed. When the motion to suppress was denied, Counsel's strategy was to attempt to impeach the victim, but she shied away from the same because impeaching a child sexual abuse victim is very

"tricky." Counsel did not want to anger the jury by "going after" the child. Instead, Counsel's strategy was to aggressively cross-examine the victim's mother, particularly about the conversation with the Petitioner. Counsel agreed that she made a tactical decision not to object during the victim's direct examination. She also agreed that she did not object during the State's closing argument if she did not think it was necessary.

On redirect-examination, regarding any inconsistencies in the victim's statements and testimony, Counsel agreed that she might have challenged the victim about her inconsistencies but stated that the same had to be done differently with children.

Counsel stated that her ultimate goal was to keep the Petitioner's conversation with the victim's mother out of the trial because she thought that portions of the conversation were harmful to the Petitioner's case. Counsel recalled that, initially, the Petitioner wanted to testify but got very nervous and decided not to. Counsel and the Petitioner discussed this decision at length.

Hollye Gallion testified that she was a pediatric nurse practitioner and testified at the Petitioner's trial. At the time of the post-conviction hearing she was certified as a sexual assault nurse examiner; that certification did not exist at the time of the Petitioner's crimes. Ms. Gallion testified that she did not interview or examine the victim in this case. Her trial testimony was generally about findings and national literature in the fields of child sexual abuse related to physical findings based on examinations of the victims. This included her testifying that, generally, ninety-three percent of sexual abuse victims do not exhibit physical signs of that abuse.

The Petitioner testified that he moved to Nashville in October 2005 with the victim's mother (his girlfriend), their shared son, the victim, and the victim's uncle, Donald Standberry. Mr. Standberry was approximately twenty-six years old at this point in time. The group moved into a two-bedroom apartment in Nashville; the Petitioner and the victim's mother shared a bedroom, the victim and her half-brother shared a bedroom, and Mr. Standberry slept on the sofa in the living room. Mr. Standberry did not have a job and was at the apartment all day most days. He also did not have a driver's license or a car. The group later moved to a three-bedroom apartment and Mr. Standberry had a room to himself; the victim continued to share a bedroom with her half-brother.

The Petitioner testified that he discussed with Counsel whether to testify at trial. They discussed possible questions and answers that might occur should he testify. He did not discuss with Counsel the layouts of the two apartments, nor did they discuss the possibility of utilizing a false confessions expert. The Petitioner stated that he had listened to the recording of his conversation with the victim's mother; he testified that what he said during that conversation was not true. The Petitioner stated that he made

7

these untrue statements because the victim's mother had threatened him and his reputation, which meant a lot to him.

The Petitioner stated that he had children with another woman, Angela Roberts. Counsel had contacted Ms. Roberts about testifying on the Petitioner's behalf about his good parenting; Ms. Roberts, however, did not testify at his trial.

On cross-examination, the Petitioner agreed that he admitted to the victim's mother in their recorded conversation that he had had sexual contact with the victim.

Following the hearing, the post-conviction court issued an order denying the Petitioner relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel. He contends that Counsel was ineffective for: (1) failing to object to and cross-examine Hollye Gallion about her expert opinion; (2) failing to investigate the concept of "false confessions" and call as a witness an expert in this field; (3) failing to investigate the presence of Donald Standberry in the house; (4) failing to object during closing argument; (5) failing to obtain a copy of the victim's forensic interview from Our Kid's; (6) failing to cross-examine the victim about the delay in her disclosure of the abuse; and (7) failing to call Angela Roberts as a witness. He further contends that the cumulative effect of Counsel's errors fell below the standards of representation and prejudiced him such that he is entitled to a new trial. The State responds that the post-conviction court properly denied relief to the Petitioner on his claims of ineffective assistance of counsel, and that he is not entitled to relief on any of the claims in his post-conviction petition. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction

court's conclusions of law, however, are subject to a purely de novo review by this court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only

9

what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### A. Hollye Gallion's Testimony

The Petitioner claims that Counsel was ineffective for failing to raise objections to and challenge the scientific validity of Ms. Gallion's testimony and for failing to effectively cross-examine Ms. Gallion at trial. He also contends that Counsel was ineffective for failing to raise the admission of Ms. Gallion's testimony as an appellate issue, which he states was a compelling argument on appeal. The State responds that Counsel objected to Ms. Gallion's testimony on several grounds and the trial court permitted Ms. Gallion's testimony on a limited basis as a result of Counsel's argument. The State further responds that the Petitioner has not shown that Counsel's examination of Ms. Gallion fell short of reasonable representation or that he suffered prejudice as a result of Counsel's performance or her decision not to raise this issue on appeal. We agree with the State.

The post-conviction court found relevant to this issue:

### State's Expert Witness

As reflected by the trial transcript, the Court qualified Ms. Gallion as an expert in the area of pediatric nursing and forensic examinations, and Ms. Gallion testified about limited issues in the jury's presence. *Id.* at 230-41. Since most of Ms. Gallion's testimony related to explaining general anatomy, [Counsel] focused the cross-examination on the fact Ms. Gallion

10

had not examined the victim in the case and, therefore, was not able to testify as to whether she observed any sign of abuse. *Id.* at 240-41.

At the post-conviction hearing, [post-conviction] counsel further cross-examined Ms. Gallion, focusing on her testimony related to the 93% statistic and an article authored by Ms. Gallion, which was published in 2016 and admitted as Exhibit 6. The Court noted from the bench that Ms. Gallion's article did not exist at the time of trial; nevertheless, Ms. Gallion testified that nothing in her later published article changed the findings she testified to at the Petitioner's trial. Based on the evidence before the Court, the Court finds the Petitioner has failed to show by clear and convincing evidence that trial counsel was ineffective as to her handling of Ms. Gallion's expert testimony or that he was prejudiced by the alleged deficiency.

The evidence does not preponderate against the court's findings. At the post-conviction hearing, Ms. Gallion testified that her trial testimony was general in nature regarding child abuse nationwide and the literature surrounding it. As she did not examine the victim prior to testifying at trial, the trial court limited her testimony on that basis to briefly cover the topic of physical examinations of child victims generally, which included a study reporting the statistic that victims do not show physical signs of abuse in ninety-three percent of cases. Counsel testified that she lodged several objections to Ms. Gallion's testimony, based on her lack of direct contact with the victim and the lack of an expert report submitted by her. Counsel cross-examined Ms. Gallion about her general research as a pediatric nurse, and at the post-conviction hearing, Ms. Gallion testified that her trial testimony had been affirmed by her later, more specific research. If anything, as the State notes in its brief, further questioning of Ms. Gallion at trial would have resulted in more testimony that would have been harmful to the Petitioner's case. Based on this evidence, the Petitioner has not shown that Counsel's decisions surrounding her cross-examination of Ms. Gallion fell below reasonable standards of representation and we will not second guess Counsel's strategy on appeal. Further, the Petitioner has not demonstrated how he was prejudiced by Counsel's representation in this regard. The Petitioner is not entitled to relief.

The Petitioner also contends that Counsel was ineffective for abandoning this issue on appeal, however, Counsel was not asked about this decision during the post-conviction hearing, and the post-conviction court did not make any findings with regard to this issue. As a general rule, this court will not address post-conviction issues that were not raised in the petition or addressed in the trial court. *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996) (citing *State v. Smith*, 814 S.W.2d 45, 49 (Tenn. 1991)); *see David Lynn Jordan v. State*, No. W2015-00698-CCA-R3-PD, 2016 WL

6078573, at *65 (Tenn. Crim. App. Oct. 14, 2016); *Richard Price v. State*, No. W2012-02192-CCA-R3-PC, 2014 WL 1512861, at *3 (Tenn. Crim. App. Apr. 16, 2014), *no perm. app. filed*; *Patrick Thurmond v. State*, No. M2005-00214-CCA-R3-PC, 2006 WL 680924, at *7 (Tenn. Crim. App. Mar. 15, 2006), *perm. app. denied* (Tenn. Aug. 21, 2006); *Torry Caldwell v. State*, No. 01C01-9703-CC-00115, 1999 WL 97915, at *2 (Tenn. Crim. App. Feb. 18, 1999), *perm. app. denied* (Tenn. June 28.1999). This court has likewise refused to review an issue when it was first raised at the post-conviction hearing, the evidence regarding the issue was "not developed in any meaningful way," and the issues was not ruled upon by the post-conviction court. *Oscar Polk, Jr., v. State*, No. W2018-01072-CCA-R3-PC, 2019 WL 911156, at *3 (Tenn. Crim. App. Feb. 15, 2019) (concluding that the issue was waived when it was absent from the petition, not ruled upon by the post-conviction court, and not meaningfully developed), *no. perm. app. filed*. Accordingly, the issue is waived.

## B. False Confessions Expert

The Petitioner contends that Counsel was ineffective for not utilizing an expert at trial on the subject of "false confessions." He contends that the post-conviction court misapplied the law when it rejected this claim and that Counsel should have pursued an expert to testify about the technique and "tactics" used by the victim's mother during her phone call with the Petitioner and about whether they elicited a false confession from the Petitioner. The State responds that the post-conviction court properly denied relief because Counsel's strategy, utilized after the motion to suppress was denied, for attacking the Petitioner's confession to the victim's mother was an informed and tactical strategy which is entitled to deference by this court. We agree with the State.

The post-conviction court made the relevant finding on this issue:

> **"False Confessions" Expert**
>
> [The Petitioner] submits that had a "false confessions" expert testified at trial, the outcome would have been different. . . . . [The Petitioner] tendered Professor Alan Hirsch as an expert at the post-conviction hearing. The Court permitted Mr. Hirsch to provide a proffer about the reliability of confessions. [Counsel] testified she had not consulted an expert as part of her trial preparation; instead, her trial strategy focused on suppressing the Petitioner's incriminating statement. [Counsel] acknowledged she filed substantive briefing on the issue; however, after an evidentiary hearing, the Court denied the motion, and this ruling was affirmed on appeal. *Sanders*, 452 S.W.3d at 305-18 (finding the Petitioner's statements were a product of "misplaced trust" and his will was

12

not overborne). Since the statements were not suppressed, the trial strategy shifted as demonstrated in the trial transcript. [Counsel] argued to the jury that the Petitioner only made admissions because his ex-wife promised she would not seek prosecution if he did so and she had threatened him into making a confession. [Counsel] further testified she had no recollection of whether she was aware of "false confessions" experts at the time of Petitioner's trial.

The Court qualified Mr. Hirsch as an expert for the purposes of the post-conviction hearing, but reserved ruling as to whether the testimony was admissible for trial purposes. The Court also advised Mr. Hirsch of this Court's prohibition of using the phrase "false confession" in the presence of the jury, as it is a commentary on the credibility of witnesses and invades the province of the jury. Since Mr. Hirsch had not evaluated the Petitioner, Mr. Hirsch had no basis to opine as to the Petitioner's suggestibility. Any trial testimony he could have provided would have been limited to the general phenomena of unreliable confessions.

. . . .

Currently, under current Tennessee law, experts may testify about interrogation suggestibility as long as the expert does not invade the province of the jury by opining as to the veracity of the statement. Admissibility of this testimony is appropriate only when relevant indicia are present and the proffered testimony is reliable.

Here, the Petitioner's statements were not the result of a police interrogation. The Petitioner made admissions during a conversation with his ex-wife/the victim's mother who wore a body wire to record the statements. In Mr. Hirsch's opinion, the necessity of a "false confessions" expert is not contingent upon the confession being made to law enforcement officer; however, Tennessee case law indicates otherwise.

Moreover, the transcript shows the types of questions Mr. Hirsch would have advised defense counsel to ask the victim's mother at trial were addressed by [Counsel] during her cross-examination. As such, the Petitioner has failed to demonstrate counsel was ineffective or that he was prejudiced by the alleged deficiency.

Mr. Hirsch conceded he had not reviewed the transcript of the cross-examination. The Court further notes the admissibility of expert testimony

about confession reliability generally is contingent upon the defendant testifying at trial.

Here, the Petitioner did not testify at his trial. [Counsel] described how the defense planned for the Petitioner to testify at trial, and [Counsel] discussed the issue with him thoroughly; however, she said the Petitioner became nervous during the State's proof and ultimately elected not to take the stand. The Petitioner also agreed at the post-conviction hearing that it was his decision not to testify at trial and he voluntarily signed the Momon waiver, which was introduced into evidence as both Exhibit 4 and 14. The Petitioner maintained he confessed only because [the victim's mother] "had threatened [him] so many times about putting [his] name in the media" and he felt she was "trying to defame [his] character." When further questioned, the Petitioner admitted he made the inculpatory statements because "[he] had [his] reason." He later clarified this reason was to protect "[his] character and [his] integrity." As discussed supra, the Petitioner's reasons for making the incriminating statements were brought before the jury at trial, particularly during [Counsel's] cross-examination of the Petitioner's ex-wife[/the victim's mother].

Accordingly, for all these reasons, the Court finds the Petitioner has failed to establish trial counsel was deficient by failing to consult an expert or that he suffered prejudice due to the alleged deficiency.

The evidence does not preponderate against this finding. Counsel testified that she was not aware of experts in the field of "false confessions" at the time of trial. She did recall questioning the victim's mother about her telephone call with the Petitioner and stated that her strategy was to aggressively question the victim's mother as to this alleged "confession" to the abuse. Strategic or tactical decisions are given deference on appeal if the choices are informed and based upon adequate preparation. *See Goad*, 938 S.W.2d at 369; *see also Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Further, the Petitioner did not demonstrate prejudice because of the lack of expert witness on this subject. Counsel's strategy on cross-examination elicited responses from the victim's mother largely similar to that which Mr. Hirsch provided his expert opinion regarding the potential falsity of the Petitioner's confessions. As such, had Mr. Hirsch or another expert been called as a witness, the Petitioner has not shown that the outcome of his trial would have been different, as the subject matter of his testimony was in essence heard and considered by the jury. The Petitioner is not entitled to relief.

## C. Investigation of Donald Standberry

14

The Petitioner next contends that Counsel was ineffective for failing to investigate Donald Standberry and his presence in the victim's home. The Petitioner claims that his presence raised issues with the victim's credibility, because she testified no one was home when the abuse occurred, and as a theory that Mr. Standberry was a potential suspect. The State responds that the Petitioner cannot show prejudice without Mr. Standberry's testimony at the post-conviction hearing and thus is not entitled to relief. We agree with the State.

The post-conviction court found in its order:

### Investigation [of Donald Standberry]

[The Petitioner] submits [that Counsel] was ineffective for failing to investigate the presence of an adult male living in the home at the time of the allegations. . . . . First, as to the Petitioner's argument the uncle could have committed the offenses, the Court notes identity was not an issue in this case. The victim knew the Petitioner (as he had been married to her mother and lived in the same house with the victim), and she identified him as committing the act charged. The Petitioner also made admissions he engaged in inappropriate sexual behavior with the child. [Counsel] testified the defense theory was not mistaken identity; rather, the theory was the Petitioner's ex-wife had motive to make false allegations against the Petitioner due to issues in their relationship. The Court credits [Counsel's] testimony and her strategic decision.

As to the Petitioner's argument Mr. Standberry could have been a potential witness, the Petitioner did not call Mr. Standberry to testify at the post-conviction hearing. . . . . This Court is not permitted to speculate on what a witness's testimony might have been if introduced by counsel. The Petitioner, therefore, has failed to establish his burden of showing [Counsel] was ineffective or that he was prejudiced by the alleged deficiency.

The evidence does not preponderate against this finding. In the case of a petitioner who is able to establish that counsel was deficient in the investigation of a witness or failing to call said witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland*. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Here, the post-conviction court noted that it was not permitted to speculate on what Mr. Standberry's testimony might have been if introduced by Counsel.

15

Without the benefit of his testimony at the post-conviction hearing, this court similarly will not make a judgment as to whether Ms. Standberry's testimony at trial or any facts within his knowledge, had they been investigated or presented, would have been favorable or material to the Petitioner's innocence. The Petitioner is not entitled to relief.

### D. Closing Argument

The Petitioner next contends that Counsel's representation was ineffective during closing arguments, specifically her failure to object during the State's argument. He contends that multiple points during the argument should have been objected to by Counsel and that the cumulative effect of Counsel's failure to object requires a reversal of his convictions. The State responds that Counsel's strategy of refraining from objecting during the State's argument is one of tactical choice entitled to deference. We agree with the State.

Relevant to this argument, the post-conviction court found:

[N]one of the statements cited by the Petitioner constitute prosecutorial misconduct warranting a new trial for the reasons stated above. Contrary to implication in the amended petition that [Counsel] did not object to any of the prosecutor's statements during closing, the record reflects [Counsel] raised an objection as to the first prosecutor['s] statement cited by the Petitioner, and the Court issued a curative instruction. [Counsel] testified, however, that she typically did not object during closing arguments as a strategic matter. The Court finds [Counsel's] testimony credible and that [Counsel] made a reasonable tactical decision.

. . . . The Petitioner did not present any evidence at the post-conviction hearing to suggest [Counsel's] failure to object to the three cited statements were anything but a tactical decision. Accordingly, for this reason and all the reasons stated above, the Court denies the Petitioner['s] request for post-conviction relief as to this ground.

The evidence does not preponderate against these findings. Counsel testified that she decided not to object during the State's closing argument if she did not think it was necessary. We note the long-standing principle that the State and the defense are allowed wide latitude in arguing their cases to the jury during closing arguments. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1994). In light of this latitude, Counsel chose to object at one point during the State's argument but otherwise made the strategic decision not to interrupt any further. Particularly in light of the rules governing closing arguments, we will not second guess Counsel's strategy on appeal, nor has the Petitioner

established that, had she objected to the various aspects of the State's argument, the jury would have returned a different verdict. The Petitioner is not entitled to relief.

## E. Forensic Interview and Disclosure

The Petitioner contends that Counsel was ineffective for failing to obtain a transcript of the victim's forensic interview and when she cross-examined the victim about her accusations without utilizing a transcript to impeach the victim. The Petitioner claims that the victim's multiple inconsistencies were ripe for impeachment but that Counsel failed to challenge the victim about her inconsistent testimony and did not have a transcript of the interview to support such a challenge. The State responds that Counsel was aware of the victim's inconsistencies but chose not to challenge the victim in regards to them because it would have angered the jury and would not have helped the Petitioner's case. Thus, the State argues that Counsel's representation was not ineffective in this regard. We agree with the State.

The post-conviction court found:

### Transcript of Forensic Interview

Related to the cross-examination and impeachment of the child victim, the Petitioner contends [that Counsel] was ineffective for failing to obtain a transcript of the [victim's] forensic interview, which was introduced at the post-conviction hearing as late-filed Exhibit 15. . . . . [Counsel] testified she remembered listening to the forensic interview recording, but due to the length of time that has passed, she deferred to the transcripts as to its substance.

First, the Court acknowledges the local District Attorney's office generally requires defense counsel to view forensic interview recordings at the DA's Office, and due to office policy, copies of these interviews are not provided as part of the discovery. At the time of the Petitioner's trial, the prosecution rarely introduced forensic interviews at trial in the case-in-chief. Thus, the State had not prepared a transcript of the forensic interview prior to the Petitioner's trial. No transcript existed until this Court ordered its preparation so it could be admitted as a late-filed exhibit for the post-conviction proceeding. [Counsel] testified she remembered she had listened to the forensic interview, but due to the passage of time, she did not recall details at the post-conviction hearing. The Court credits [Counsel's] testimony[.] . . . . [Counsel's] cross-examination demonstrated she was prepared and aware of the [victim's] previous statements. Nothing in the

record suggests [Counsel] was ineffective in handling the discrepancies in the victim's story at trial.

The Court has reviewed the interview transcript and the transcript of the victim's trial testimony, and finds no significant discrepancies. Initially, during the forensic interview, the victim indicated she felt compelled to submit to the Petitioner's requests "[b]ecause there was nobody in the house, and if [she] screamed [the Petitioner would] cover [her] mouth." Shortly thereafter, however, the victim described how some of the incidents occurred when her brother and [C.R.] (her step-sister) were present in the home although the victim was not sure if they had seen anything; she just assumed the other children might have because they were "always be looking at [their daddy]." Although the victim did not mention the presence of [C.R.] during her trial testimony, the victim did testify about the presence of her brother, as she had done during the forensic interview.

The victim's brother was six years old at the time of Petitioner's trial in 2011, making him two or three years old at the time of the offenses. During the forensic interview in 2008, the victim indicated [C.R.] was six years old. Given both the victim's brother and step-sister were young children, even if they had witnessed interactions between the Petitioner and the victim, they may not have understood what was happening or have been able to provide any meaningful testimony. Regardless, the Petitioner did not call either the victim's brother or [C.R.] to testify as to whether they witnessed any abuse. This Court may not speculate as to their testimony, and the Petitioner has failed to meet his burden on this issue.

Concerning the victim's discrepancies as to whether her mother hit her with a hairbrush, the victim testified on cross-examination that her mother repeatedly hit her. Although the victim denied her mother had harmed her during the forensic interview, the record reflects [Counsel] used the [victim's] trial testimony about prior physical abuse to support the defense theory that the victim had been coerced by her mother to make up the allegations. For instance, [Counsel] cross-examined the victim about how she was intimidated by her mother and would do what her mother said, implying the child had lied about the abuse. The Court finds [Counsel] made a reasonably based strategic decision. The Petitioner has failed to establish by clear and convincing evidence that [Counsel] was ineffective nor has he established he was prejudiced by any alleged deficiency.

18

The evidence does not preponderate against these findings. Counsel testified that she reviewed the video recording before trial and could have challenged the victim on her inconsistent statements but Counsel knew this would be tricky given the victim's age. Counsel made the tactical decision not to "go after" the victim but instead to aggressively challenge her mother. This is another tactical decision that is within Counsel's purview to make based on her twenty-two years of experience with juries in criminal trials and we will not second guess her decision here.

The Petitioner also contends that Counsel was ineffective for failing to cross-examine the victim about the delay in her disclosure. The post-conviction court found:

### Disclosure

The Court finds [Counsel's] testimony credible and that [Counsel] made a reasonably based strategic decision. . . . . Although Post-Conviction Counsel disagrees with the tactic and would have pursued an alternative strategy does not undermine the validity of the strategic decision employed by [Counsel]. The Petitioner has failed to establish by clear and convincing evidence that [Counsel] was ineffective nor has he established he was prejudiced by any alleged deficiency.

The same tactical reasoning applied to Counsel's decision not to attack the victim with regards to this aspect of the case, and our analysis is the same. The Petitioner is not entitled to relief.

### F. Angela Roberts

Lastly, the Petitioner contends that Counsel was ineffective for failing to call Ms. Roberts as a character witness to testify about the Petitioner's good parenting. The State responds that as Ms. Roberts was not presented as a witness at the post-conviction hearing, this argument carries no weight. We agree with the State.

The post-conviction court found:

### Interviewing Potential Witnesses

The Petitioner alleges trial counsel was [in]effective for failing to interview his daughter, [C.R.], and her mother, Angela Roberts. . . . The Petitioner submits Ms. Roberts "could have offered testimony that: she and [the Petitioner] previously dated and had a child together, at times [the

Petitioner] had sole custody of their female child, and that their child never reported any unusual or inappropriate behavior from [the Petitioner]."

Neither potential witness testified at the post-conviction hearing. Post-Conviction Counsel provided an affidavit swearing she had been unable to locate Angela Roberts during the post-conviction proceedings. . . . . [Counsel] agreed she had access to investigators should they be needed to locate any witnesses. [Counsel] testified she had spoken with Ms. Roberts during her trial preparation and recalled Ms. Roberts was "not friendly" and indicated Ms. Roberts had become a hostile witness. The Court credits [Counsel's] testimony.

. . . . The Petitioner was unable to locate Ms. Roberts to testify at the post-conviction hearing, and there is no proof she even was available as a witness at the time of the trial. Most significantly, neither Ms. Roberts nor her daughter testified before this Court. Since this Court is not permitted to speculate on what a witness's testimony might have been if introduced by counsel, (Black,794 S.W.2d at 757), the Court finds the Petitioner has failed to establish by clear and convincing evidence that [Counsel] was ineffective by not calling either witness nor has he demonstrated he was prejudiced by the alleged deficiency.

As we have stated, a petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland*. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Here, Counsel attempted to contact Ms. Roberts; Counsel testified that she was not cooperative. Because the Petitioner's did not present her as a witness at the post-conviction hearing, we have no indication as to whether her testimony would have been favorable to his case. As such, the Petitioner is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

20